UNITED STATES of America,
Appellee,

v.

David I. SHACKNEY, Appellant.

No. 302, Docket 28500.

United States Court of Appeals
Second Circuit.

Argued March 4, 1964.

Decided June 5, 1964.

See also D.C., 31 F.R.D. 550.

Ira B. Grudberg, New Haven, Conn. (Jacobs, Jacobs, Jacobs & Jacobs, New Haven, Conn.), (Howard A. Jacobs, New Haven, Conn., on brief), for appellant.

Howard A. Glickstein, Washington, D. C. (Burke Marshall, Asst. Atty. Gen., Robert C. Zampano, U. S. Atty., Harold H. Greene and Gerald W. Jones, Attorneys, Department of Justice, Washington, D. C.), for appellee.

Before MOORE and FRIENDLY, Circuit Judges, and DIMOCK, District Judge.*

FRIENDLY, Circuit Judge.

In July, 1962, a grand jury in the District Court for Connecticut returned a nine count indictment charging David I. Shackney with violations of 18 U.S.C. §§ 1581(a) and 1584. The former section makes it a crime, punishable by a fine of not more than $5,000, or imprisonment of not more than five years, or both, to hold or return "any person to a condition of peonage" or to arrest "any person with the intent of placing him in or returning him to a condition of peonage." The latter section subjects to similar punishment "Whoever knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude, any other person for any term, or brings within the United States any person so held * * *." The first two counts of the indictment charged the holding of Luis Oros and his wife, Virginia Oros, in a condition of peonage in Middlefield, Conn., from July 12, 1961, to March 3, 1962. The other seven counts charged the holding to involuntary servitude of Luis, Virginia, their four daughters and their son, at the same place and for the same time. Trial before Judge Blumenfeld and a jury be-gan late in January, 1963, and continued until mid-March. At the end of the Government's case the court granted a motion for acquittal on the two counts relating to the wife; later, on being required to elect between the peonage count and the involuntary servitude count as to the husband, the Government consented to dismissal of the former. Reserving decision on a motion for acquittal on the remaining six counts, all under § 1584, relating to Luis and the five children, the judge submitted the case to the jury, which rendered verdicts of guilty on all. Subsequently the judge denied Shackney's motions for an acquittal and for a new trial and entered the judgment of conviction whence this appeal is taken. We hold that the Government did not show commission of the crime defined by § 1584.

Taking the evidence most favorably to the Government, we summarize this, noting only a few of the many items that were contradicted. However, we must add in fairness that this gives an unbalanced impression of the record as a whole, since it omits substantial evidence favorable to Shackney, much of it developed on Oros' cross-examination,[1] which we would be obliged to analyze carefully if, accepting the Government's broad construction of the statute, we found it necessary to rule on Shackney's contentions that the evidence still did not warrant a jury's finding his guilt to have been proved beyond a reasonable doubt and that his conviction may have resulted from unfair conduct by the prosecutor.

Shackney, who had been ordained as a rabbi in Poland, came to the United States with his wife in 1941. During the period charged in the indictment he taught afternoon classes at the B'nai

---

* Sitting by designation.

1. Perhaps the most impressive single item was a series of letters from Oros indicating satisfaction with conditions on the farm and urging his married son Luis, Jr. and his daughter-in-law to join the family there, and a telephone call in which Shackney talked to Luis, Jr. in Oros' presence. The explanation that Oros was writing only what he thought Shackney would like to see hardly covers the urging of the son and daughter-in-law to come to Middlefield—something which, according to the letters, was a project of Oros, which Shackney joined largely to accommodate him.

Jacob School near New Haven, where his wife also taught; on two evenings a week he lectured on the Talmud to adult audiences in Middletown and New Haven. In addition, under the name of Maytav Kosher Packing Corporation, of which he was president, he operated a chicken farm adjacent to his home in Middlefield.

Shackney had found it hard to get American farm laborers who would accommodate themselves to the hens' annoying disregard for week-ends. Having seen an advertisement in a trade journal as to the availability of Mexican workers, he went to Mexico City in late June 1960, and hired two families, the Chavez' and the Olguins. One evening he hailed a taxi to take him to a theatre. The taxi was driven by Oros, then 40, who had been a Mexico City taxi driver for some eleven years. Oros had been in the United States as a railroad worker for nine months in 1944 in Wilmington, Delaware, and again in 1945–46 in Nevada. Talk in the taxi led, according to Oros, to Shackney's saying he needed still another family for the farm and Oros' offering his own. Shackney made it plain that Oros would have to sign a two-year contract, during which he was never to drink or to leave the farm. Undeterred, Oros took Shackney to his house to meet the family; Shackney said he had a house like it on his farm. The family being away, Oros later brought them to Shackney's hotel. Shackney, who was leaving the next morning, told Oros to prepare his immigration papers and to communicate with him.

Oros set about procuring his papers but letters to Shackney as to his progress were unanswered. In January, 1961, Shackney telegraphed Oros to phone him; Oros confirmed that he still desired to come. After developments unnecessary to detail, Oros, his wife and his eldest daughter Maria Elena signed a contract, in Spanish, to work on Shackney's farm. This provided, among other things, that the contract should have a two-year term beginning August 15, 1961; that together with another couple

the three Oros' would care for 20,000 laying hens; that the hours of work were to be from 6:30 A.M. until the work was completed, with three breaks; that "because of the fact that our work will be handling living things which must be carefully cared for, this work must be done every day, 7 days a week and 365 days a year with no exception"; that they were to receive a furnished place to live, with heat, electricity and gas for cooking, and sufficient food; and that their combined salary should be $160 per month for the first year and $240 for the second, half of which was to be deposited in a joint bank account as security for their performing their obligations.

Since Oros had encountered difficulty in obtaining visas, he asked Shackney to come to Mexico City to help. It was apparently on this occasion that Shackney allegedly made two statements much emphasized by the Government:

"You have contract, if you break this contract, I deport you and you never come back to the United States, not you, not your son, and not your grandsons, nobody, because I have lot of friends in Mexico and the United States, too, and I have lot of money, and money is money here or any place."

In contrast,

"If you are nice man and you work in my farm the two years like say the contract, after two years you are American citizen and then you can go any place, you are free, you go to work in taxi-cab or you go to California if feel you want to go. You want stay in my farm, you can stay."

It developed that Oros had no money to pay for his visas or transportation save for $80 which he had borrowed and turned over to Shackney. The latter arranged for funds to be provided but insisted on the signing by Oros of twelve promissory notes for $100 each, payable monthly, and their co-signing by a friend, Rosalio, who owned his own home. The next day Shackney made Oros sign six

additional $100 notes, allegedly explaining merely "You have confidence in me, you sign, and that's all." According to Oros, Shackney paid only $350 for bus tickets and $210 for expenses in connection with the visas. Shackney claimed the $1200 notes had covered $500 for the expense of procuring visas and other documents, and $700 for plane tickets, which Oros had wrongfully diverted to the payment of his debts, and that the $600 notes covered another $380 that had to be paid for bus tickets, $40 for spending money for Oros and a contribution toward the expense of Shackney's own trip. After four days and five nights of travel the Oros' reached the farm in the morning of July 12, 1961, and were immediately put to work.

They found the conditions of life less attractive and the work more arduous than they had pictured. Their dwelling was a four-room half of a Quonset hut, set upon wooden pilings; the walls were of corrugated cardboard; and there were holes in the floor which Shackney told Oros to cover. Two of the rooms were bedrooms, with a total of two beds and a cot for the family of seven, there was a bathroom, and the other room contained kitchen facilities, an automatic hot water heater, a large television set and later a radio as well. The dwelling was heated by a wood stove. There was some criticism of the food, but the Government does not make this a serious item of complaint. Shackney gave the Oros' used clothing, and also furnished them with some new clothes, toilet articles and postage stamps which he said would ultimately have to be paid for. Although the contract called only for the services of the parents and the eldest daughter, all seven of the family worked, the two youngest children, aged 9 and 7, starting their labors at 10:00 A.M. instead of 6:30 A.M. when the others began.[2] There is dispute whether so many would have had to labor so long if Oros had worked diligently, the defense claiming the television set had proved unduly distracting. Shackney raised the monthly salary for the parents and Maria Elena to $180 and also drew monthly checks of $20 to Maria Teresa and Sergio, the second and third eldest children. However, the Oros' received no cash since Shackney would get them to endorse the checks and would tear up two $100 notes each month;[3] the only cash they obtained during the entire period was $10 which Shackney gave them at the request of a purchaser of chickens whom they had helped.[4]

None of the Oros children went to school. Oros claimed that Shackney had said that the school was too far away, that the Oros' had no money to pay for the school, the school bus and clothing, and that the children could not speak English; Shackney countered that he had urged Oros to send the children to school but that Oros had objected. Oros also testified that a request for permission to attend the movies and a few requests to go to church were denied. Oros left the farm on only four occasions, Shackney going along on all save one. Until the latter months of the Oros' stay on the farm, all outgoing letters from the Oros' were given for posting to Shackney, who supplied the stamps; all incoming letters for the farm were placed in a rural post box and letters to the Oros' were delivered by him. There was evidence from which the jury could find that Shackney censored the Oros'

2. The Chavez family had left just before the Oros' arrived; apparently the Olguins had left earlier.

3. Oros claimed that in February, 1962, he protested that he had now paid the original $1200 notes and did not expect to have to pay the $600 notes he had later signed at Shackney's request, and that Shackney then introduced the subject of interest, at 10% a month, which he illustrated by a computation introduced in evidence. Shackney offered a totally different explanation of this incident.

4. The chickens were sold in January, 1962. The Oros' then had to clean the chicken coop, and Oros testified this made them work harder than ever. There were later discussions as to the purchase of more chickens.

mail, although he stoutly denied this. Oros testified that Shackney had instructed him not to talk with persons who came to the farm and to send them away if Shackney was not there, and that he was reprimanded when he violated these instructions.

Oros and Maria Elena testified that from the first day they had come to the farm they wished to leave it because the house was so different from what had been represented.[5]  It is admitted that none of the Oros' ever communicated this desire to Shackney, and that they were never restrained from leaving either by force or the threat of force. The farm is not in open country. It is on School Street in Middlefield, four-tenths of a mile west of a main highway connecting Meriden and Middletown, which is nearby. There is a house about 500′ east of Shackney's residence and there are four others between the latter and the highway; a considerable housing development is near enough that the Oros' could hear the sounds from it. The driveway from the road passes Shackney's house and then winds back to the Oros' hut. At all times a truck was kept near the hut, with the keys in the ignition; at times Oros drove it. There were long periods every week, both daytime and evening, when the Oros' were left alone while the Shackneys were away on their teaching duties. Once a week a man came on the farm with feed for the chickens, egg pickups were made twice weekly, and other helpers were coming and going.

The Government's case was that the Oros' did not dare avail themselves of the easy methods of release admittedly available because their wills were overborne by fear which Shackney had engendered. Oros and Maria Elena testified they were always afraid. Of prime importance was the fear of deportation if they left. Here the Government linked the conversation in Mexico in July, 1961, that if Oros broke his contract he would be deported, with incidents in which Shackney spoke of deportation for other causes. A notable one occurred around September or October; Oros quoted Shackney's description how a "man he say is too lazy and don't do everything, and say sometime he's drunk, too, so is bad man; and sometime he do something Mr. Shackney don't like, and this time Mr. Shackney say are very mad, and take him from * * * the chicken coop, and * * * send back to Mexico in half hour." [6]  Also the Government linked the reference to powerful friends in the Mexican statement with Shackney's saying to Oros while on the farm that "all the neighbors, the Post Office man, the policeman, and—well, he say everybody is a friend, the neighbors, police, and Post Office, and everybody is. When another time he say have money * * * and money is money everywhere." The young son, Sergio, testified that on one occasion Shackney had become irritated and "told to my family that I am irresponsible boy. If I don't do the work, he going to send back to Mexico, then I have to go. Then I went to the bathroom and I was crying right there * * * and then he told me not to cry any more; that I made him feel very bad to think he had made us cry. * * * Then he took me to his home and he gave me a small package of candies, and he told me if I would go on being his friend, and I said 'Yes.' That was it." On other occasions Shackney threatened that if any of the Oros' became ill, they would be sent back. A further fear-engendering factor was a threat in February, 1962, that unless Oros paid the notes that Rosalio had co-signed, "somebody take

5. Maria Elena testified that the first day she was on the farm "I think I was in prison because when I work, this day we work hard and we never did before in Mexico."

6. Although the Government's brief says that "Many times appellant told Oros and his family stories of this type", there seems to have been at most one other such incident. The two other references cited, one in Oros' testimony and one in Maria Elena's, are quite obviously to the same incident recounted in the text.

my friend's house, and this thing I know when I sign the notes, and this is where I am scared to leave the farm." [7]

In January and February, 1962, Oros talked with persons coming to the farm and gave some of them letters to mail. One of these was to a Mr. Davalos in Philadelphia. Mr. and Mrs. Davalos came to the farm on Saturday, March 3, and asked to see Oros. Shackney at first declined to permit them either to visit Oros or to drive him to town; later he agreed they might see Oros a few hours hence. He asked Oros and the family to clean themselves and their house, cautioned that the guests were not to remain too long, and offered to provide refreshments. Meanwhile the Davalos' communicated with Officer Cabelus of the Connecticut State Police. Cabelus returned with them, interviewed Oros, and took Oros to his office. Mrs. Davalos requested that he call an attorney; this was done around 10 P.M. After Oros' return to the farm, Shackney questioned him, around 1 A.M., as to what he had said. On learning that Oros had told Cabelus, among other things, that the children didn't go to school "because you don't want my children to go out the farm" and that nobody went to church "because you don't want never nobody go out the farm," Shackney asked whether Oros didn't know "if you say this, this is a crime" and ordered him to leave at once—an order whose execution Shackney later postponed to Sunday morning when the Oros' departed with the Davalos' under the supervision of Officer Cabelus who had supplied a truck to carry their belongings. Before leaving Connecticut for Philadelphia, Oros and the Davalos' called on the lawyer, who wrote Shackney on March 7 that the Oros' claimed that the latter and his company "are guilty of servitude" and suggested "an amicable settlement." A week later, after a call from Mrs. Dava-

los to the lawyer, Oros was contacted in Philadelphia by the F. B. I., whose investigation led to the indictment.

█ The first and, in our view, dispositive issue is the reach of the language of 18 U.S.C. § 1584, "Whoever knowingly and willfully holds to involuntary servitude * * *." The Government suggests in effect that this is equivalent to "Whoever knowingly and willfully holds to service by duress." To test the consequences of such a reading, appellant's brief put a series of cases, starting with that of a man chained to his work bench and kept under restraint at all times, and ranging through the instant case to others where an employer threatens an employee who wishes to leave his service with blackballing in the industry, revealing a crime to the police, or preventing the employee's son from achieving a much desired admission to Yale. The Government manfully answered that all these cases constitute a holding to involuntary servitude, although also denying "that the outer limits of that statute need be explored in this case." With the most profound respect for the illustrious university at New Haven, we cannot believe that retention of an employee by a threat to prevent his son's admission there was quite what Congress had in mind when, in the great words of the 13th Amendment, it forbade a holding in involuntary servitude; and a court does not discharge its duty by saying that although it cannot tell just what a penal statute does forbid, it is confident that the case *sub judice* falls within it. When criminal statutes use "abstractions of common certainty," E. Freund, The Use of Indefinite Terms in Statutes, 30 Yale L.J. 437 (1921), courts must give what has been aptly called "a pointing definition—a direction which attaches them to that one object to which they refer," if the statute is to escape

---

7. The testimony as to this threat having been made in February, 1962, is somewhat hard to reconcile with Oros' admission that by that time the twelve notes co-signed by Rosalio had been surrendered to him. Of course, Oros might have been mistaken as to the date or have feared such action without any express threat. See fn. 17, infra.

condemnation as void for vagueness.[8] Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926); Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939).

Our endeavor to construe the statute had best begin with its history. There is an initial puzzlement why the Criminal Code should contain two provisions, one relating to peonage, § 1581, and the other to involuntary servitude, § 1584, since any case that could be reached under the former section could also be reached under the latter.[9]

The section with respect to peonage is a century old, deriving from the Act of March 2, 1867, 14 Stat. 546, a prompt exercise of the power granted Congress by § 2 of the 13th Amendment, which had become effective December 18, 1865, "to enforce this article by appropriate legislation." In its original form, entitled "An Act to abolish and forever prohibit the System of Peonage in the Territory of New Mexico and other Parts of the United States," § 1 of this Act provided:

> "That the holding of any person to service or labor under the system known as peonage is hereby declared to be unlawful, and the same is hereby abolished and forever prohibited in the Territory of New Mexico, or in any other Territory or State of the United States; and all acts, laws, resolutions, orders, regulations, or usages of the Territory of New Mexico, or of any other Territory or State of the United States, which have heretofore established, maintained, or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons,

in liquidation of any debt or obligation, or otherwise, be, and the same are hereby, declared null and void; and any person or persons who shall hold, arrest, or return, or cause to be held, arrested, or returned, or in any manner aid in the arrest or return of any person or persons to a condition of peonage, shall, upon conviction, be punished by fine not less than one thousand nor more than five thousand dollars, or by imprisonment not less than one nor more than five years, or both, at the discretion of the court."

In the Revised Statutes the first two clauses appear as § 1990 under the title "Civil Rights"; the third, the direct ancestor of § 1581(a), is § 5526 under the title "Crimes."[10]

In contrast, § 1584 is a relative newcomer to the statute book. It dates only from 1948, 62 Stat. 773, although, as the Reviser's Notes tell us, it supposedly represents a "consolidation" of two much older statutes. One was a part of the series of enactments of the first quarter of the nineteenth century dealing with the African slave trade, other portions of which survive, in somewhat altered form, as 18 U.S.C. §§ 1582 and 1585–1587, see Hollander, Slavery in America, 33–35 (1964); this statute, Act of April 20, 1818, c. 91, § 6, 3 Stat. 452, later Rev.Stat. § 5377, § 248 of the Criminal Code of 1909, 35 Stat. 1139, and 18 U.S. C. § 423 (1940 ed.), was directed at "Every person who brings within the jurisdiction of the United States, in any manner whatsoever, any negro, mulatto, or person of color, from any foreign kingdom or country, or from sea, or holds, sells, or otherwise disposes of, any negro, mulatto, or person of color so brought in, as a slave, or to be held to service or labor * * *." The other parent was the Act of June 23, 1874, 18 Stat. 251, "An act

**8.** See Professor Amsterdam's already classical discussion, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U. Pa.L.Rev. 67, 90–92 (1960).

**9.** Peonage involves the additional element that the involuntary servitude is tied to

the discharge of an indebtedness. Clyatt v. United States, 197 U.S. 207, 215, 25 S. Ct. 429, 49 L.Ed. 726 (1905).

**10.** § 1581(b) stems from § 2 of the Act of 1867, 14 Stat. 546, later Rev.Stat. § 5527.

to protect persons of foreign birth against forcible constraint or involuntary servitude." This provided that "whoever shall knowingly and wilfully bring into the United States, or the Territories thereof, any person inveigled or forcibly kidnapped in any other country, with intent to hold such person so inveigled or kidnapped in confinement or to any involuntary service, and whoever shall knowingly and wilfully sell, or cause to be sold, into any condition of involuntary servitude, any other person for any term whatever, and every person who shall knowingly and wilfully hold to involuntary service any person so sold and bought, shall be deemed guilty of a felony * * *." This statute was aimed at abuses practiced against Italian children who were being recruited to perform as street musicians, see United States v. Ancarola, 1 F. 676 (Cir.Ct. N.Y.1880); United States v. McClellan, 127 F. 971, 977–78 (S.D.Ga.1904). It was said in the House, "* * * this bill is intended to prevent the practice of enslaving, buying, selling, or using Italian children * * *" Cong.Record, 43 Cong. 1 Sess. 4443 (1874), a purpose not adequately served by a prior act of May 21, 1866 "to prevent and punish Kidnapping," 14 Stat. 50, since this applied only to those who participated in or aided in the kidnapping, enticing, or carrying away of "any other person, whether negro, mulatto, or otherwise, with the intent that such other person shall be sold or carried into involuntary servitude" and did not necessarily apply to the person who exacted the servitude. The peonage statute also was evidently thought insufficient to cope with this problem because it required proof that the involuntary service was to work out a debt. Although broader than the peonage statute in that respect, the Act of 1874 was narrower in others; it applied

only if the person had been "inveigled or kidnapped" or had been sold.[11] The 1874 statute became § 271 of the 1909 Code, 35 Stat. 1142, and 18 U.S.C. § 446 (1940 ed.).

The Reviser's statement that 18 U.S.C. § 1584 simply "consolidated" these sections with changes of phraseology necessary to effect consolidation, was thus quite inaccurate. The two statutes, neither of which would cover the instant case, had purposes and effects different from each other and from their "consolidation." Since, in contrast to Title 18 of the 1926 Code, the 1948 enactment of Title 18 constitutes "positive law," 62 Stat. 683, our search must be for the meaning of § 1584 rather than of its two parents. But the history, along with the statement of a consultant to the revisers "In general, with a few exceptions, the Code does not attempt to change existing law," Holtzoff, Preface to Title 18 U.S. C.A. vi, at least forbids any view that Congress considered § 1584 to be staking out important new ground. Cf. Fourco Glass Co. v. Transmirra Prod. Corp., 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957). We read its reference to involuntary servitude as covering the same type of compulsory holding as was proscribed by its parent statutes, comparable to the holding which was a necessary element of the crime of peonage.

For illumination as to what kinds of holding were so prohibited we turn initially to Supreme Court decisions under the peonage statute, all reviewed in Pollock v. Williams, 322 U.S. 4, 64 S.Ct. 792, 88 L.Ed. 1095 (1944). In Bailey v. Alabama, 211 U.S. 452, 29 S.Ct. 141, 53 L.Ed. 278 (1908), 219 U.S. 219 (1911); Taylor v. Georgia, 315 U.S. 25, 62 S.Ct. 415, 86 L.Ed. 615 (1942); and Pollock v. Williams, the peonage statute was used, in Mr. Justice Jackson's phrase, "as a shield"—namely, to invalidate convic-

11. The restriction was deliberate. The Senate Judiciary Committee amended the original bill (H.R. 3581) by deleting the words:

"And whoever shall knowingly and wilfully hold any other person in involuntary

confinement or to any involuntary service, or who shall transfer any such service to any other person except for the purpose of acquiring a trade or occupation, in the United States, or the Territories thereof."

tions under state laws making it a crime for servants owing debts or other types of debtors to leave their employment; by their very nature these decisions can shed little light on our problem since the obligation to serve was enforced by the criminal laws of the state. Two cases in which the statute was used "as a sword" are not much more helpful. In United States v. Reynolds, 235 U.S. 133, 35 S.Ct. 86, 59 L.Ed. 162 (1914), an employer had a laborer convicted under an Alabama statute making it a crime for a convict "working out" a fine paid by the surety to refuse to labor further. United States v. Gaskin, 320 U.S. 527, 64 S.Ct. 318, 88 L.Ed. 287 (1944), arose on a demurrer to an indictment charging that defendant had forcibly arrested a debtor, detained him against his will, and transported him with intent to cause him to perform labor in satisfaction of the debt. The decision was simply that the district court had erred in dismissing the indictment for failure to allege that services had in fact been rendered after the arrest. Language in Clyatt v. United States, 197 U.S. 207, 25 S.Ct. 429, 49 L.Ed. 726 (1905), is more enlightening for our purposes, although the decision itself is not. The case came before the Court on an indictment charging that defendant did "unlawfully and knowingly return one Will Gordon and one Mose Ridley to a condition of peonage, by forcibly and against the will of them, * * * returning them * * * to work to and for Samuel M. Clyatt * * to work out a debt claimed to be due * * *." The evidence showed that Clyatt had gone from Georgia to Florida to have Gordon and Ridley arrested and brought back. Defining peonage "as a status or condition of compulsory service, based upon the indebtedness of the peon to the master," equating "compulsory service" with "involuntary servitude," and distinguishing this from "the voluntary performance of labor or rendering of services in payment of a debt" where "no law or force compels performance or a continuance of the service," 197 U.S. at 215–216, 25 S.Ct. at 430, the Court held that although there was abundant evidence that the Florida criminal proceedings were only an excuse "for securing the custody of Gordon and Ridley, and taking them back to Georgia to work out a debt," there was no evidence that Gordon and Ridley had previously been in a condition of peonage to which they were being *returned*—the offense specified in the indictment. "That they were in debt, and that they had left Georgia and gone to Florida without paying that debt, does not show that they had been in a condition of peonage, or were even at work, willingly or unwillingly, for their creditor." 197 U.S. at 222, 25 S.Ct. at 433.

Failing to find a clear answer in these Supreme Court cases under the peonage act, we explore the earlier history of the term "involuntary servitude." A draft of the Northwest Ordinance drawn in 1784, almost certainly by Thomas Jefferson, contained a provision "That, after the year 1800 of the Christian era, there shall be neither slavery nor involuntary servitude in any of the said states, otherwise than in the punishment of crimes whereof the party shall have been duly convicted to have been personally guilty." [12] It seems reasonably plain that what Jefferson meant to ban by the words "involuntary servitude" was the legal enforcement of "conditional servitude under indentures or covenants" such as had long existed in Virginia, see 1 Bancroft, History of the United States 175 (1859 ed.); Miller, New History of the United States 70–73 (1958), at least to the extent that such indentures were not entered into voluntarily without the compulsion of a previously existing debt or obligation. Although this provision was not enacted in 1784, § 14, Article VI of the Ordinance of 1787, which replaced the version of three years earlier, provided "There shall be neither slavery nor involuntary servitude in the said territory, otherwise than in the punishment

12. Swayne, The Ordinance of 1787 and the War of 1861, p. 32 (1892).

484

of crimes, whereof the party shall have been duly convicted"; agreement of the Congress to include this seems to have been won by the addition of a proviso, immediately following, "[t]hat any person escaping into the same, from whom labor or service is lawfully claimed in any one of the original states, such fugitive may be lawfully reclaimed, and conveyed to the person claiming his or her labor or service as aforesaid."

Provisions outlawing slavery and involuntary servitude were included in the constitutions of the states to which the Ordinance applied. The Illinois Supreme Court held a statute allowing the owner of a slave to bring him into Illinois and bind him to agree to work for a term of years, for breach of which he would be returned to slavery outside the Northwest Territory, to be inconsistent with the Ordinance, although further holding that an indenture entered into legally without fraud or collusion could be valid in Illinois by virtue of the adoption of a constitutional provision and its acceptance by the Congress of the United States upon the admission of that state into the union. Phoebe v. Jay, 1 Ill. (Breese) 268 (1828). The Indiana Supreme Court had earlier issued *habeas corpus* to liberate a house maid, ruling that even an indenture voluntarily entered would not justify enforcement of involuntary service thereunder.[13] Matter of Clark, 1 Blackf. 122 (1821). The Missouri Compromise of 1820, 3 Stat. 548, entitled "An Act * * * to pro-

hibit slavery in certain territories," contained a declaration and a proviso substantially identical with the Northwest Ordinance, and such provisions were included in the constitutions of states governed thereby. During the war between the states, an Act of April 16, 1862 prohibited slavery or involuntary servitude in the District of Columbia, 12 Stat. 376, and the Act of June 19, 1862, 12 Stat. 432, did the same with respect to the territories.[14] Hence it was natural that these historic words should be used in the 13th Amendment—"Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." The debates show nothing here relevant save what would have been obvious without them—an intention to follow the words of the Northwest Ordinance.

The first judicial interpretation of this phrase in the 13th Amendment that we have found is in Tyler v. Heidorn, 46 Barb. 439, 458 (Albany General Term, 1866). The court there said:

"The term *involuntary servitude,* in my opinion, is substantially synonymous with *slavery,* though it may perhaps be regarded as slightly more comprehensive, and as embracing every thing under the name of *servitude,* though not denominated slavery, which gives to one person the control and ownership of the involuntary and compulsory *services*

---

13. From a contemporary account of the debates among the framers of the Ohio Constitution of 1802, it appears that the words "involuntary servitude" may not then have been thought to encompass an indenture freely entered into for bona fide consideration. The prohibition adopted for that constitution, thought to be coextensive with the prohibition of the Ordinance, made an exception for an indenture entered into "while in a state of perfect freedom and on a condition of a bona fide consideration received or to be received for their service." See quotation from Journal of delegate Judge Ephraim Cutler in Swayne, The Ordinance of 1787 and the War of 1861, 57–58 (1892).

Whatever doubt there may have been as to the applicability of these words to a condition of compulsory service voluntarily entered was dispelled by the time they were incorporated into the 13th Amendment. This is attested by the passage of the anti-peonage statute in 1867—peonage being a condition generally assumed by voluntary contract. See The Peonage Cases, 123 F. 671, 673–675 (M. D.Ala.1903). See also Clyatt v. United States, supra, 197 U.S. at 215, 25 S.Ct. at 430.

14. The Emancipation Proclamation, which related only to the states in rebellion, spoke solely of "persons held as slaves," 12 Stat. 1267.

of another against his will and consent."

Not long after came the more authoritative statement in Mr. Justice Miller's opinion in the Slaughter-House Cases, 16 Wall. (83 U.S. 36, 69, 21 L.Ed. 394 (1873):

> "The exception of servitude as a punishment for crime gives an idea of the class of servitude that is meant. The word 'servitude' is of larger meaning than 'slavery,' as the latter is popularly understood in this country, and the obvious purpose was to forbid all shades and conditions of African slavery. It was very well understood that in the form of apprenticeship for long terms, as it had been practiced in the West India Islands, on the abolition of slavery by the English government, or by reducing the slaves to the condition of serfs attached to the plantation, the purpose of the article might have been evaded, if only the word 'slavery' had been used." [15]

See also Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883).

Important material is found in Hodges v. United States, 203 U.S. 1, 16–17, 27 S.Ct. 6, 8, 51 L.Ed. 65 (1906), a case which, although heavily relied upon by the Government, is rather more helpful to appellant. The Court said that "All understand by these terms [slavery and involuntary servitude] a condition of enforced compulsory service of one to another," and referred to dictionary definitions of slavery as "the state of entire subjection of one person to the will of another" and of servitude as "the state of voluntary or compulsory subjection to a master." The first Mr. Justice Harlan's dissent characterized peonage as "the compulsory holding of one individual by another individual for the purpose of compelling the former, by personal service, to discharge his indebtedness to the latter," and stated its disagreement with the majority by saying that "One who is shut up by superior or overpowering force, constantly present and threatening, from earning his living in a lawful way of his own choosing, is as much in a condition of involuntary servitude as if he were forcibly held in a condition of peonage." 203 U.S. at 34, 27 S.Ct. at 16. The final datum is Butler v. Perry, 240 U.S. 328, 332, 36 S.Ct. 258, 259, 60 L.Ed. 672 (1916), where the Court said, in language reminiscent of the Slaughter-House opinion:

> "This [13th] Amendment was adopted with reference to conditions existing since the foundation of our government, and the term 'involuntary servitude' was intended to cover those forms of compulsory labor akin to African slavery which, in practical operation, would tend to produce like undesirable results."

This survey indicates to us that the prime purpose of those who outlawed "involuntary servitude" in the predecessors of the 13th Amendment, in the Amendment itself, and in statutes enacted to enforce it, was to abolish all practices whereby subjection having some of the incidents of slavery was legally enforced, either directly, by a state's using its power to return the servant to the master, as had been the case under the peonage system in New Mexico, see The Peonage Cases, 123 F. 671, 673–675 (M.D.Ala.1903), or indirectly, by subjecting persons who left the employer's service to criminal pen-

---

15. The dissenting opinion of Mr. Justice Field stated that the words involuntary servitude "include something more than slavery in the strict sense * * *; they include also serfage, vassalage, villenage, peonage and all other forms of compulsory service * * *." He went on to speculate that legislation which restricted a person to a single trade or calling or to a single locality might place him with respect to others in a condition of servitude, but did not rest his opinion on this ground.

alties.[16] Rather plainly, however, the term goes farther. The 13th Amendment, unlike the 14th, is not addressed solely to state action, and it would be grotesque to read "involuntary servitude" as not covering a situation where an employee was physically restrained by guards, as in Davis v. United States, 12 F.2d 253 (5 Cir.), cert. denied, 271 U.S. 688, 46 S.Ct. 639, 70 L.Ed. 1153 (1926); see also In re Turner, 24 Fed.Cas. p. 337, No. 14,247 (D.Md.1867), or, coming closer to this case, if the Oros' had been isolated in a secluded farm with barbed wire fences and locked gates. Various combinations of physical violence, of indications that more would be used on any attempt to escape, and of threats to cause immediate legal confinement, whether for the escape or some other reason, have also been held sufficient. Bernal v. United States, 241 F. 339 (5 Cir. 1917), cert. denied, 245 U.S. 672, 38 S.Ct. 192, 62 L.Ed. 540 (1918); Pierce v. United States, 146 F. 2d 84 (5 Cir. 1944), cert. denied, 324 U.S. 873, 65 S.Ct. 1011, 89 L.Ed. 1427 (1945); United States v. Ingalls, 73 F. Supp. 76 (S.D.Calif.1947). But we see no basis for concluding that because the statute can be satisfied by a credible threat of imprisonment, it should also be considered satisfied by a threat to have the employee sent back to the country of his origin, at least absent circumstances which would make such deportation equivalent to imprisonment or worse.[17] A credible threat of deportation might well constitute such duress as to invalidate any agreement made under its influence, as, for example, if on the completion of the Oros' contract Shackney had threatened to have them deported unless they made another; very likely, also, if something was sought or obtained for withdrawing such a threat, the maker could be successfully prosecuted under state blackmail or extortion statutes. But a holding in involuntary servitude means to us action by the master causing the servant to have, or to believe he has, no way to avoid continued service or confinement, in Mr. Justice Harlan's language, "superior and overpowering force, constantly present and threatening," 203 U.S. at 34, 27 S.Ct. at 16—not a situation where the servant knows he has a choice between continued service and freedom, even if the master has led him to believe that the choice may entail consequences that are exceedingly bad. This seems to us a line that is intelligible and consistent with the great purpose of the 13th Amendment; to go beyond it would be inconsistent with the language and the history, both pointing to the conclusion that "involuntary servitude" was considered to be something "akin to African slavery," Butler v. Perry, supra, 240 U.S. at 332, 36 S.Ct. at 259, although without some of the latter's incidents. While a credible threat of deportation may come close to the line, it still leaves the employee with a choice, and we do not see how we could fairly bring it within § 1584 without encompassing other types of threat, quite as devastating in the particular case as that of deportation may have been to the Oros', whose inclusion would make the

16. An even narrower interpretation seems indicated by a dictum in Robertson v. Baldwin, 165 U.S. 275, 280–281, 17 S.Ct. 326, 41 L.Ed. 715 (1897), but this is scarcely reconcilable with the Supreme Court decisions applying the peonage statute summarized above.

17. The judge rightly instructed the jury to disregard "any threat to enforce the payment of notes signed by Luis Oros and to proceed legally against the Oros' friend as endorser of those notes in order to obtain payment * * *," as it is within the rights of a mortgagee to threaten to enforce the security which the contract gives him for nonperformance. In fact, Oros' testimony that desire to protect his friend was a motivating factor works against the view that his will was overcome by the threats of deportation which the Government claims to come within the prohibition of the statute. The evidence as to threats of deportation for inefficiency or illness seems to have been relevant only to show further assertions by Shackney of power to cause deportation; threats of that sort alone would plainly not meet the statutory test.

statute an easy tool for blackmail and other serious abuse. Friction over employment punctuated by hotheaded threats is well known and inevitable. But the subjugation of another's will through such threats is more easily accused than accomplished. There must be "law or force" that "compels performance or a continuance of the service," Clyatt v. United States, supra, 197 U.S. at 215–216, 25 S.Ct. at 430, for the statute to be violated.

Whether or not the 13th Amendment would permit passing this line, we are not convinced Congress has done so. If a makeweight were needed for our construction that the statute applies only to service compelled by law, by force or by the threat of continued confinement of some sort, the rule as to interpreting a statute to avoid "grave and doubtful constitutional questions," United States v. Delaware & Hudson Co., 213 U.S. 366, 407–408, 29 S.Ct. 527, 53 L.Ed. 836 (1909), would afford one. Another would be the equally established canon that "When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will" with respect to a criminal statute, "the ambiguity should be resolved in favor of lenity." Bell v. United States, 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955).

It goes without saying that if defendant's conduct was what the Oros' testified and the jury evidently believed, this would have been highly reprehensible. But before deciding to make such conduct a felony, punishable with up to five years' imprisonment, a legislator would wish to weigh the advantages to society in providing deterrence and retribution where the conduct had in fact occurred against the risk that innocent employers might be victimized by disgruntled employees able to convince prosecutors, and ultimately juries, of their story, and the consequent possible preferability of dealing with the evil by less drastic means. The most ardent believer in civil rights legislation might not think that cause would be advanced by permitting the awful machinery of the crim-inal law to be brought into play whenever an employee asserts that his will to quit has been subdued by a threat which seriously affects his future welfare but as to which he still has a choice, however painful. Before we would assume that Congress meant to encompass such cases or consider whether it would have the power to do so, we would require clearer evidence of legislative purpose than repetition of the history-laden term, "holds to involuntary servitude."

The judgment of conviction is reversed, with instructions to dismiss the indictment.

DIMOCK, District Judge (concurring).

As I read the majority opinion, the distinction that it draws is between the servitor's belief that he is being confined, by law, by force or by threat of force and his submitting to continued service because of a threat of another kind. I cannot find this distinction between different *means* of confinement to be implied by the statute.

The opinion rejects what I would consider the plain and intended meaning of "involuntary" as dealing only with the will of the servitor. That word raises the question of whether the will of the servitor has been subjugated, i. e., whether he has been rendered incapable of making a rational choice, and not the question of what were the means by which the servitude was imposed. It is impossible to generalize the means by which the will of man can be subjugated. What to one man is a paralyzing threat is to another merely a harsh alternative. Threats of force are the most extreme of threats to most of us but there are many who can brave this risk and will crumble in the face of others. To a drug addict the threat of deprivation of his supply is certainly more overbearing than the threat of almost any kind of force, yet it is a means falling outside of the majority's guilt criterion.

On the other hand cases may be supposed within the majority's guilt criterion where the servitude would not be in-

voluntary. Take the case of United States v. Ingalls, D.C.S.D.Cal.S.D., 73 F.Supp. 76, cited by the majority. There was there a threat of prosecution and consequent imprisonment by the employer of a maidservant. All that my brethren would require in that case would be that she believe that the threat would be carried out. The Ingalls opinion, however, went into great detail as to the domination exercised by the employer and reached the conclusion, p. 78, that the servant "was a person wholly subject to the will of defendant; that she was one who had no freedom of action and whose person and services were wholly under the control of defendant." The mere belief of a threat of imprisonment is not, to my mind, enough to satisfy the requirement of the statute. The victim must also have such fear of the consequences as to deprive him of will power.

The servitude may be voluntary though imposed by a means falling within the majority's guilt criterion and may be involuntary though imposed by a means falling without that criterion.

The "void for vagueness" doctrine does not compel us to substitute for the statutory test of involuntariness an arbitrary classification of means. To have an arbitrary classification which will resolve with equal facility all of the cases that would arise under the statute is indeed a tempting prospect. It is much harder to have to work under a statute which will raise difficult questions in the borderline cases inevitable wherever the application of a statute depends upon an appraisal of the state of the human mind. Statutes are not, however, void for vagueness because they raise difficult questions of fact. They are void for vagueness only where they fail to articulate a definite standard. Jordan v. De George, 341 U.S. 223, 229–232, 71 S.Ct. 703, 95 L.Ed. 886. I should not have thought that a statute fixing involuntariness as a standard would fall within that class.

Where the subjugation of the will of the servant is so complete as to render him incapable of making a rational choice, the servitude is involuntary within the terms of the statute and it is only where there is such subjugation that the servitude is involuntary. Where a master "willfully" thus subjugates a servant's will, he has violated section 1584 of Title 18 of the United States Code. Unless he does so, there is no such violation. There is no evidence in the record from which the jury could have found willful subjugation of a servant's will. I concur in the result.