**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**David MUSSRY, Elsa Singman Nee Mussry, Lily Judah Nee Mussry, also known as Lulu, Nasim Mussry, Jack Sassoon Nee Mussry, Moses Aslan, Mordecai Sassoon, also known as Moody Sassoon, also known as Maudy Sassoon, Saul Mizrahie, Al Mizrahie, Defendants-Appellees.**

No. 83–5093.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 3, 1983.

Decided March 1, 1984.

Walter Barnett, Louise A. Lerner, Dept. of Justice, Washington, D.C., for plaintiff-appellant.

John D. Vandevelde, Los Angeles, Cal., Harold Greenberg, Sherman Oaks, Cal., for defendants-appellees.

Before FARRIS and REINHARDT, Circuit Judges, and SOLOMON,* District Judge.

REINHARDT, Circuit Judge:

The defendants were indicted on charges of holding individuals in peonage and involuntary servitude. The district court dismissed most of the counts. It concluded that those counts failed to sufficiently charge the defendants with a "holding" in involuntary servitude under 18 U.S.C. §§ 1581, 1583, and 1584 (1982) because they failed to allege that the defendants used or threatened to use law or force. We hold that a violation of the peonage and involuntary servitude statutes may occur through conduct other than the use or threatened use of law or force and that all of the counts are sufficient to charge the defendants with the crimes enumerated. Accordingly, we reverse.

The defendants are charged with violating 18 U.S.C. §§ 1581 (holding in peonage), 1583 (enticement into involuntary servitude), 1584 (holding in involuntary servitude), and 371 (conspiracy). The indictment and bill of particulars allege that the defendants unlawfully held poor, non-English speaking Indonesian servants against their will by enticing them to travel to the United States, paying them little money for their services, and withholding their passports and return airline tickets, while requiring them to work off, as servants, the debts resulting from the costs of their transportation. The government claims that the defendants' conduct effectively coerced the workers into remaining in their service and therefore constituted a holding in involuntary servitude.

According to the indictment and bill of particulars: The Indonesian servants were required to work up to 15 hours per day seven days a week. The defendants routinely denied all requests for vacations. Most of the servants cleaned the defendants' houses, cooked meals for the defendants, massaged them, and served them in a variety of other ways. Some did landscaping and gardening and engaged in household construction for the defendants. All of the servants lived in the defendants' homes.

The district court dismissed all counts under 18 U.S.C. §§ 1581, 1583, and 1584 which failed to allege that the defendants used, or threatened to use, law or force to hold the workers against their will.[1] The district court also deleted all references to involuntary servitude, peonage, and slavery from the conspiracy count.

The government contends that the district court misconstrued the law when it concluded that a "holding" in involuntary servitude can be accomplished only through the use, or threatened use, of law or physical force. Accordingly, the government urges that the district court erred in holding that the indictment and bill of particulars are not sufficient to charge the defendants with violations of the statutes.

We have jurisdiction to review the dismissal of the substantive counts and the partial dismissal of the conspiracy count under 18 U.S.C. § 3731 (1982). *See United States v. Marubeni America Corp.,* 611 F.2d 763, 764–65 (9th Cir.1980).

---

* Honorable Gus J. Solomon, Senior District Judge for the District of Oregon, sitting by designation.

1. The district court denied a motion to dismiss four counts alleging violations of 18 U.S.C. §§ 1581 and 1584. Those counts alleged that the defendants warned the servants that they would be arrested if they attempted to leave the defendants' house. The district court also refused to dismiss one count alleging a violation of 18 U.S.C. § 1583. That count alleged that the defendants kept one worker in their custody while in Indonesia and tricked him into boarding an airplane flying to the United States. These counts are not challenged here.

## "HOLDING" IN INVOLUNTARY SERVITUDE

18 U.S.C. § 1584, in relevant part, provides that "[w]hoever knowingly and willfully holds to involuntary servitude ... any other person for any term ... shall be fined ... or imprisoned ... or both."[2] The question of what is sufficient to constitute a "holding" under 18 U.S.C. §§ 1581, 1583, and 1584 is a question of law that we address de novo. See, e.g., Donovan v. Southern California Gas Co., 715 F.2d 1405, 1407 (9th Cir.1983) (per curiam). Because we are reviewing a dismissal of the charges, we need only decide whether the indictment and bill of particulars are sufficient to charge the defendants with a criminal offense, rather than whether sufficient facts have been adduced to prove that the defendants committed a crime. See United States v. Buckley, 689 F.2d 893, 897 (9th Cir.1982), cert. denied, —— U.S. ——, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983).

■ The 13th amendment and its enforcing statutes are designed to apply to a variety of circumstances and conditions. Neither is limited to the classic form of slavery. Both apply to contemporary as well as to historic forms of involuntary servitude. The amendment and statutes were intended

> not merely to end slavery but to maintain a system of completely free and voluntary labor throughout the United States.... [I]n general, the defense against oppressive hours, pay, working conditions, or treatment is the right to change employers. When the master can compel and the laborer cannot escape the obligation to go on, there is no power below to redress and no incentive above to relieve a harsh overlordship or unwholesome conditions of work.  .

Pollock v. Williams, 322 U.S. 4, 17–18, 64 S.Ct. 792, 799, 88 L.Ed. 1095 (1944); see Bailey v. Alabama, 219 U.S. 219, 241, 31 S.Ct. 145, 151, 55 L.Ed. 191 (1911); United States v. Booker, 655 F.2d 562, 564, 566 (4th Cir.1981) ("The amendment and the legislation were intended to eradicate not merely the formal system of slavery that existed in the southern states prior to the Civil War, but all forms of compulsory, involuntary service."; citations omitted); see also Schnapper, Perpetuation of Past Discrimination, 96 Harv.L.Rev. 828, 831–36 (1983) (recounting history surrounding Southern legislatures' enactment of black codes that were designed to " 'lock' former slaves into the service of their old masters"). Because of that purpose, it has long been recognized that "[t]he words involuntary servitude have a 'larger meaning than slavery.'" Bailey v. Alabama, 219 U.S. at 241, 31 S.Ct. at 151 (quoting The Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 69, 21 L.Ed. 394 (1872)).

In deciding the issues before us, we must consider the realities of modern economic life: yesterday's slave may be today's migrant worker or domestic servant. See United States v. Booker, 655 F.2d 562, 566 (4th Cir.1981).[3] Today's involuntary servi-

---

**2.**  18 U.S.C. § 1581, in relevant part, provides that "[w]hoever holds or returns any person to a condition of peonage ... shall be fined ... or imprisoned ... or both."

18 U.S.C. § 1583, in relevant part, provides that "[w]hoever kidnaps or carries away any other person, with the intent that such other person be sold into involuntary servitude, or held as a slave ... [s]hall be fined ... or imprisoned ... or both."

The government concedes that, because peonage is involuntary servitude for the purpose of liquidating a debt, see Clyatt v. United States, 197 U.S. 207, 215, 25 S.Ct. 429, 430, 49 L.Ed. 726 (1905), it must establish a holding in involuntary servitude in order to charge the defendants with violating section 1581. The defendants' sole objection to the indictment and bill of particulars is that the government does not sufficiently charge them with a holding in involuntary servitude. Therefore, in reviewing the dismissal of all of the counts, we need only decide whether the indictment and bill of particulars are sufficient to charge the defendants with a holding in involuntary servitude.

Hereafter, we refer to all three statutes collectively as the involuntary servitude statutes.

**3.**  The most recent applications of the involuntary servitude statutes have involved migrant farm laborers. See United States v. Harris, 701 F.2d 1095 (4th Cir.), cert. denied, —— U.S. ——, 103 S.Ct. 3554, 77 L.Ed.2d 1400 (1983); United States v. Booker, 655 F.2d 562 (4th Cir.1981); United States v. Bibbs, 564 F.2d 1165 (5th Cir.

tor is not always black; he or she may just as well be Asian, Hispanic, or a member of some other minority group.[4] Also, the methods of subjugating people's wills have changed from blatant slavery to more subtle, if equally effective, forms of coercion.

The question of what forms of coercion may serve as the basis for a finding of a violation of the involuntary servitude statutes is not a simple one. In *United States v. Shackney*, 333 F.2d 475, 487 (2d Cir.1964), the Second Circuit held that "[t]here must be 'law or force' that 'compel[led] performance or a continuance of the service'" in order for there to be such a finding. (*quoting Clyatt v. United States*, 197 U.S. 207, 215–16, 25 S.Ct. 429, 430, 49 L.Ed. 726 (1905)).[5] Relying on *Shackney*, the defendants claim that, because the indictment and bill of particulars do not allege the use, or threatened use, of law or *physical* force, the district court was correct in dismissing the charges.

We agree with the defendants that the most reasonable interpretation of *Shackney* is that a holding in involuntary servitude may occur only when there is the use, or threatened use, of law or physical force. However, while a test that looks to the use of law or physical force attempts to draw a clear line between lawful and unlawful conduct and has the apparent advantage of simplicity, it is too narrow to fully implement the purpose of the 13th amendment

and its enforcing statutes. That a broader test is required was recognized in Judge Dimock's concurring opinion:

> [the] meaning of "involuntary" . . . deal[s] only with the will of the servitor. That word raises the question of whether the will of the servitor has been subjugated, i.e., whether he has been rendered incapable of making a rational choice, and not the question of what were the means by which the servitude was imposed. . . . Where the subjugation of the will of the servant is so complete as to render him incapable of making a rational choice, the servitude is involuntary within the terms of the statute . . . .

*Shackney*, 333 F.2d at 487–88 (Dimock, J., concurring).

The essence of a holding in involuntary servitude is the exercise of control by one individual over another so that the latter is coerced into laboring for the former. *See Bailey v. Alabama*, 219 U.S. 219, 241, 31 S.Ct. 145, 151, 55 L.Ed. 191 (1911); *Wicks v. Southern Pacific Railroad Co.*, 231 F.2d 130, 138 (9th Cir.), *cert. denied*, 351 U.S. 946, 76 S.Ct. 845, 100 L.Ed. 1471 (1956). The use, or threatened use, of law or physical force is the most common method of forcing another to enter into or remain in a state of involuntary servitude. *See, e.g., United States v. Harris*, 701 F.2d 1095, 1098 (4th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct.

---

1977), *cert. denied*, 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388. (1978). The reason is evident. As the Fourth Circuit noted,

> [t]he statutes [were designed to] protect[ ] persons similarly situated to the migrant workers of our own time. They were persons without property and without skills save those in tending the fields. With little education, little money and little hope, they easily fell prey to the tempting offers of "powerful and unscrupulous" individuals . . . who would soon assert complete control over their lives. . . . [T]he statute must be read not only to render criminal the evil Congress sought to eradicate so long ago but, as well, its Twentieth Century counterpart.

*United States v. Booker*, 655 F.2d 562, 566 (4th Cir.1981) (citation omitted).

**4.** We do not mean to suggest that the 13th amendment and its implementing statutes are not applicable to Caucasians as well. *See*

*Hodges v. United States*, 203 U.S. 1, 16–17, 27 S.Ct. 6, 8–9, 51 L.Ed. 65 (1906), *overruled on other grounds, Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 442–43 n. 78, 88 S.Ct. 2186, 2204–05 n. 78, 20 L.Ed.2d 1189 (1968). However, at *the present moment in our history*, minority group members, and particularly undocumented aliens, are the ones most likely to be the victims when violations of those statutes occur.

**5.** The language in *Clyatt v. United States*, 197 U.S. 207, 215–16, 25 S.Ct. 429, 430, 49 L.Ed. 726 (1905), which was quoted in *Shackney*, was not a holding but merely part of a general discussion that explained the difference between compulsory and free labor; labor is not compulsory even if the person may be subjected to a civil action for breach of contract. *Clyatt* does not in any way suggest that the "force" compelling continued labor must be physical force.

3554, 77 L.Ed.2d 1400 (1983); *United States v. Booker,* 655 F.2d 562, 563 (4th Cir.1981). However, "the means or method of coercion" is not the determinative factor in deciding whether there is a holding. *Pierce v. United States,* 146 F.2d 84, 86 (5th Cir. 1944); *see United States v. Bibbs,* 564 F.2d 1165, 1167 (5th Cir.1977), *cert. denied,* 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978); *Shackney,* 333 F.2d at 487–88 (Dimock, J., concurring).

Conduct other than the use, or threatened use, of law or physical force may, under some circumstances, have the same effect as the more traditional forms of coercion—or may even be more coercive; such conduct, therefore, may violate the 13th amendment and its enforcing statutes. The crucial factor is whether a person intends to and does coerce an individual into his service by subjugating the will of the other person. A holding in involuntary servitude occurs when an individual coerces another into his service by improper or wrongful conduct that is intended to cause, and does cause, the other person to believe that he or she has no alternative but to perform the labor.

In determining the question of involuntariness, the court should consider whether the challenged conduct would have had the claimed effect upon a reasonable person of the same general background and experience. Thus, the particular individual's background is relevant in deciding whether he or she was coerced into laboring for the defendant. *E.g., Pierce v. United States,* 146 F.2d 84, 85–86 (5th Cir.1944); *United States v. Ingalls,* 73 F.Supp. 76 (S.D.Cal. 1947); *see United States v. Reynolds,* 235 U.S. 133, 150, 35 S.Ct. 86, 90, 59 L.Ed. 162 (1914) (Holmes, J., concurring); *Shackney,* 333 F.2d at 488 (Dimock, J., concurring); Shapiro, *Involuntary Servitude: The Need For a More Flexible Approach,* 19 Rut.L. Rev. 65, 81–84 (1964).

We recognize that economic necessity may force persons to accept jobs that they would prefer not to perform or to work for wages they would prefer not to work for. Such persons may feel coerced into laboring at those jobs. That coercion, however, results from societal conditions and not from the employer's conduct. Only improper or wrongful conduct on the part of an employer subjects him to prosecution. To illustrate this point further, an employer who truthfully informs an individual that there are no other available jobs in the market, merely provides an opportunity for a person to work for low wages, or simply takes advantage of circumstances created by others is not guilty of an offense. An employer who has not engaged in improper or wrongful conduct has not violated the law. It is the act of the employer, as well as the effect upon the worker, that the 13th amendment and its enforcing statutes address.

Here, the bill of particulars alleges that the Indonesian servants generally had almost no education, were unskilled, spoke little, if any, English, and had never been outside Indonesia. Although they received higher wages in the United States than they had received in Indonesia, their wages were far below the minimum wage. Most of the workers were in the United States illegally. They were brought here by the defendants. The defendants allegedly compelled the servants to surrender their passports and return airplane tickets, and required them to work in their employ in order to repay the costs of their transportation to the United States. In short, the government claims that

> [the defendants] knowingly placed [the Indonesian servants] in a strange country where [they] had no friends, had nowhere to go, did not speak English, had no work permit, social security card, or identification, no passport or return airline ticket to return to Indonesia, [were] here as . . . illegal alien[s], with no means by which to seek other employment, and with insufficient funds to break [their] contract[s] by paying back to defendant[s] the alleged expenses incurred in getting . . . here.

Bill of Particulars, page 16; *see id.* page 30. Given these allegations, and particularly those relating to the retention of the pass-

ports and airline tickets, we cannot (for purposes of a motion to dismiss the indictment) view the defendants as "innocent" parties to the traditional employer-employee relationship.[6]

The indictment and bill of particulars allege conduct that, if proved, is sufficient to demonstrate improper or wrongful acts by the defendants that were intended to coerce the Indonesian servants into performing service for the defendants. The indictment sufficiently alleges that the conduct had the intended effect. Although the bill of particulars also indicates that some of the servants left the defendants' homes without apparent retaliation by the defendants, that is merely relevant evidence which could be introduced to rebut the government's case if the defendants claim that their conduct was not such as would have caused a reasonable person to become an involuntary servitor. The opportunity to escape, and even successful escape, is not enough in and of itself to preclude a finding that a person was held in involuntary servitude. *See United States v. Booker,* 655 F.2d 562, 567 (4th Cir.1981); *United States v. Bibbs,* 564 F.2d 1165, 1168 (5th Cir.1977), *cert. denied,* 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978). All counts of the indictment, including those relating to the servants who left the defendants' homes, must stand.

## THE VAGUENESS CHALLENGE

The defendants assert that if we conclude that a holding in involuntary servitude may be accomplished absent the use, or threatened use, of law or physical force, the statutes would be rendered so vague that they would violate the due process clause of the fourteenth amendment. We disagree.

In order to survive a vagueness challenge, "a penal statute [must] define the criminal offense with sufficient definiteness [so] that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* —— U.S. ——, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citations omitted); *see Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982); *United States v. Ocegueda,* 564 F.2d 1363, 1365 (9th Cir.1977). "[N]o individual [may] be forced to speculate, at peril of indictment, whether his conduct is prohibited." *Dunn v. United States,* 442 U.S. 100, 112, 99 S.Ct. 2190, 2197, 60 L.Ed.2d 743 (1979) (*citing Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972)).

However, "[i]t is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975) (citation omitted) (quoted in *United States v. Bohonus,* 628 F.2d 1167, 1173 (9th Cir.), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980)). We therefore need only decide whether the defendants had fair notice that the conduct that they allegedly engaged in was prohibited.

To give fair notice of what constitutes a criminal offense, a statute need not be drafted as precisely as it possibly could have been:

[F]ew words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no

---

**6.** The defendants suggest that, because the Indonesian servants voluntarily contracted to work for higher wages than they earned in Indonesia, the allegations are not sufficient to charge a holding in involuntary servitude. We disagree. Even though a person may come to a job voluntarily, subsequent coerced service constitutes involuntary servitude. *See United States v. Harris,* 701 F.2d at 1100. In addition, 18 U.S.C. § 1581, which prohibits the holding of another in involuntary servitude for purposes of liquidating a debt, *see* note 2 *supra,* limits the ability to enforce a contract for labor.

more than a reasonable degree of certainty can be demanded.

*Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367 (1952) (footnote omitted); *see United States v. Powell,* 423 U.S. 87, 94, 96 S.Ct. 316, 320, 46 L.Ed.2d 228 (1975); *United States v. Wise,* 550 F.2d 1180, 1186 (9th Cir.), *cert. denied,* 434 U.S. 929, 98 S.Ct. 416, 54 L.Ed.2d 290 (1977). Accordingly, a penal statute should not be so narrowly "construed as to interfere with the federal government's ability to efficiently administer its criminal laws." *In re Subpoena of Persico,* 522 F.2d 41, 64 (2d Cir.1975) (quoted in *United States v. Prueitt,* 540 F.2d 995, 1002 (9th Cir.1976), *cert. denied sub nom., Temple v. United States,* 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780 (1977)).

The language of 18 U.S.C. §§ 1581, 1583, and 1584 is not the most precise. But the breadth in that language was necessary in order to prohibit new forms of compulsory labor that might arise—rather than just the type that existed in the ante-bellum South. The language is not so opaque that ordinary people would not have notice that the conduct allegedly engaged in by the defendants was prohibited. Although close questions may arise in interpreting the language of a criminal statute, that alone does not render a statute unconstitutionally vague. *See Boyce Motor Lines,* 342 U.S. at 340, 72 S.Ct. at 330; *United States v. Douglass,* 579 F.2d 545, 548 (9th Cir.1978). Nor is the language so broad as to create the potential for arbitrary law enforcement.

"[T]he constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea.*" *Colautti v. Franklin,* 439 U.S. 379, 395, 99 S.Ct. 675, 685, 58 L.Ed.2d 596 (1979) (citations omitted; footnote omitted); *see, e.g., United States v. United States Gypsum Co.,* 438 U.S. 422, 434–46, 98 S.Ct. 2864, 2871–78, 57 L.Ed.2d 854 (1978); *United States v. Wise,* 550 F.2d 1180, 1186 (9th Cir.), *cert. denied,* 434 U.S. 977, 98 S.Ct. 542, 54 L.Ed.2d 472 (1977). The fact that the statute requires that an individual must have acted with the intent

of coercing another into his service goes a long way toward alleviating any vagueness problems. It is difficult to argue that a person did not have notice that certain conduct was illegal when the offense requires that the conduct be improper or wrongful and that the actor intend that the conduct have a coercive effect.

An inquiry into whether a "reasonable person" would be coerced into the service of another does not by itself create the potential for arbitrary and discriminatory enforcement. *See Coates v. City of Cincinnati,* 402 U.S. 611, 613 & n. 3, 91 S.Ct. 1686, 1688 & n. 3, 29 L.Ed.2d 214 (1971); *see also Chaplinsky v. New Hampshire,* 315 U.S. 568, 573, 62 S.Ct. 766, 770, 86 L.Ed. 1031 (1942) (relying on the fact that the state court had narrowed the statutory language to only prohibit speech that would incite "men of common intelligence" to fight, in upholding a criminal statute in the face of vagueness and first amendment challenges); *Standard Oil Co. v. United States,* 221 U.S. 1, 60, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911) ("rule of reason" standard applied to determine whether conduct violated the criminal antitrust laws).

We expect that criminal prosecutions under the involuntary servitude and peonage statutes will occur only in rare circumstances. Here, the defendants had fair notice that their conduct, which, allegedly, was designed to have and did have an unlawful effect, was prohibited. The absence of a requirement that coercion be accomplished by means of physical force or law does not render the statutes unconstitutionally vague.

CONCLUSION

For purposes of 18 U.S.C. §§ 1581, 1583, and 1584, the use, or threatened use, of law or physical force is not an essential element of a charge of "holding" in involuntary servitude. Other forms of coercion may also result in a violation of the involuntary servitude statutes. The allegations that the defendants engaged in specific improper or wrongful conduct with the intent to coerce the Indonesian servants into performing

services for them involuntarily, and that the conduct had the intended effect, are sufficient to preclude dismissal. All counts in the indictment must stand.

The order of the district court dismissing the substantive counts and partially dismissing the conspiracy count is reversed and the case is remanded.

REVERSED AND REMANDED.