UNITED STATES of America, Plaintiff,

v.

William Alexander LEWIS, a/k/a My Lord Prophet; William A. Lewis, a/k/a Prophet David Israel; William Lenard Lewis, a/k/a Judah Israel; Muriel S. King, a/k/a Prophetess Leah Israel; Robert A. McGee, a/k/a Ezekiel Israel; Larry E. Branson, a/k/a Jabez Israel; Theodore R. Jones, Sr., a/k/a Jacob Israel; Eddie L. Green, Jr., a/k/a Samson Israel; and James Nelson, a/k/a Methusalem Israel, Defendants.

No. G85–133 CR.

United States District Court,
W.D. Michigan, S.D.

Sept. 22, 1986.

Civil Rights, Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

Larry C. Willey, Grand Rapids, Mich., for William Alexander Lewis.

Dennis Kolenda, Grand Rapids, Mich., for William Lenard Lewis.

Michael B. Quinn, Grand Rapids, Mich., for Muriel S. King.

Leroy Kramer, Grand Rapids, Mich., for Robert A. McGee.

Charles S. Rominger, Jr., Grand Rapids, Mich., for Larry E. Branson.

Anthony J. Valentine, Grand Rapids, Mich., for Theodore R. Jones, Sr.

Robert Mirque, Grand Rapids, Mich., for Eddie L. Green, Jr.

Victor Smedstad, Grand Rapids, Mich., for James Nelson.

## OPINION AND VERDICT

HILLMAN, Chief Judge.

An initial comment or two might be appropriate. First of all, this unusual case involves, to some extent at least, the religious beliefs and practices of a small, black religious sect whose beliefs are highly unorthodox and far from the mainstream of traditional, religious concepts in this country. It should be obvious to all that those facts alone have no bearing on the guilt or innocence of the accused. This country thrives on diversity. First Amendment rights are sacred. The fact that middle class American public opinion, white and black, may hate and despise the religious teachings of the House of Judah, has had no effect in my efforts to analyze the charges, the evidence, and the law in this case. Since the Scriptures have been freely quoted throughout this case, perhaps I will be pardoned if I quote a favorite text of my own: "Thou shalt not follow a multitude to do evil."

I have made every effort to avoid the heavy media coverage. Furthermore, nothing said by defendant Nelson when he pled guilty has had the slightest influence on my decision.

John A. Smietanka, U.S. Atty., Daniel L. Bell II, Susan J. King, Criminal Section—

The other side of that coin, however, is the obvious fact that religious leaders are no more immune from criminal prosecution than other citizens. Reverend Moon learned that lesson when he was convicted and imprisoned for income tax violations.

A second point should also be noted. This is not a prosecution for murder, manslaughter, or child abuse. Those proceedings were properly left to state law enforcement officials. Although beatings and other brutal conduct are relevant to this case, as will be demonstrated later, one must nevertheless be careful to keep in mind that the charges in this federal prosecution are related exclusively to the Thirteenth Amendment; that is, slavery.

On November 21, 1985, a federal grand jury in the Western District of Michigan returned a two count indictment against the defendants William A. Lewis, William L. Lewis, Muriel S. King, Robert A. McGee, Larry Branson, Theodore R. Jones, Eddie L. Green, Jr., and James Nelson. All eight defendants are charged in count I with conspiring to hold John Yarbough and other minor victims namely, Edwin Harris, Russell Harris, Shawn Nelson, and Emmanuel Jones, to involuntary servitude in violation of 18 U.S.C. § 241. Additionally, count I alleges that as a result of the conspiracy and the actions of the defendants, John Yarbough died. All defendants, except Muriel King, are also charged in count II with holding John Yarbough to involuntary servitude in violation of 18 U.S.C. § 1584 and § 2. These events allegedly occurred at a residential camp, commonly referred to as the House of Judah, located near Grand Junction in Allegan County, Michigan.

Prior to trial, defendant James Nelson pled guilty to count I (18 U.S.C. § 241, without death resulting) under an agreement providing, among other things, that the Government would move to dismiss count II at the time of sentencing.

Also prior to trial, the court granted defendants' motion to "strike the Government's jury demand," which order was subsequently affirmed by the Court of Appeals for the Sixth Circuit.

Thereafter, this bench trial commenced on August 8, 1986 and consumed a total of 20 trial days. The court heard 25 witnesses and received and reviewed 71 exhibits.

Contrary to most criminal cases, few facts in this case are in serious dispute. All of the defendants are members of a black, religious sect known as the House of Judah. It originated in the Chicago ghetto under the leadership of defendant William A. Lewis known as the "Prophet". The evidence is undisputed that from the very beginning he is the unchallenged head and ruler of the House of Judah. He is referred to as "My Lord Prophet David Israel" by other members including the defendants and bowed to and deferred to in all matters. The Prophet believes in the literal interpretation of the Old Testament; that he, as the Prophet, is God's representative on earth; that membership in the House of Judah is a prerequisite to salvation; that the members of his cult, black Hebrews, are the only legitimate, chosen people and the true historical Israelites. The Prophet also believes that all non-members are heathens, sinful and unworthy; that the road to salvation requires a learning of the distinction between good and evil as set forth in the Old Testament and as taught by the Prophet and further, that corporal punishment, referred to as "chastisement," is a proper and necessary means of punishment for those who break the rules of the House of Judah.

The group started with classes held in Chicago. Then, as the movement grew, the Prophet organized a camp in Western Michigan located in a relatively remote, rural area approximately 20 miles from Allegan. The camp consisted of close to 100 people who lived in approximately 30 trailers as well as two homes, one occupied by the Prophet and the other by defendant Muriel King, also known as "the Prophetess." In addition, there were other buildings on the property, one being a meeting hall and the other a classroom. The camp also had an area set aside for swings and other play-

ground equipment for children. There were no fences or other barriers around the perimeter of the camp. Also on the property were a number of animals such as goats and cows.

As described by one of the witnesses, during the early years (middle to late '70s) the camp environment was warm, cooperative and friendly. By 1981, however, life at the camp began to change. Apparently the Prophet reached the conclusion that the House of Judah members were backsliding, breaking camp and/or biblical rules. As a result, he established whippings as a means of punishment or chastisement.

In March 1982, the Prophet caused a document to be prepared and signed by adult members of the House of Judah in which members agreed to accept punishment for "sins against God and my Lord and also for my children." Punishment was specified in the document to include death, banishment, confiscation of material goods, imprisonment, beating, burning, hanging or stoning of both the adult member and that member's children. Prior thereto punishment had included fines, work assignments and the digging of large holes. But by 1981, "chastisement" included beatings which could be imposed for such transgressions as disrespect for or disobedience to the Prophet, refusal to do assigned work, or violation of camp rules. As an implementation of the new whipping policy and as a means of instilling fear in both adults and children, Prophet Lewis ordered construction of a whipping block. It was fashioned after the stocks used in colonial days containing holes for the head and hands to confine offenders during the whippings.

In addition to the Prophet, the camp was also run by a council composed of the Prophet's closest associates, including his son and the Prophetess. All of the council members were appointed by the Prophet, and all of the defendants, during the period covered by the indictment, served at one time or another on this leadership council. Most of the whippings were done in the presence of the entire camp membership with the council members located near the stock and next to the Prophet. It was the practice of the Prophet, upon being advised of a member's transgression, to consult the council for a recommendation as to how many "licks" should be administered. It was the undisputed testimony that the Prophet would then order the transgressor to step forward. Making reference to some biblical authority or rule, the Prophet would order the individual into the stock to be beaten anywhere from 5 to 80 "licks." A heavy wooden axe handle labeled "Big Mac" was the implement used to beat the men, women and at least the bigger children. Defendants Jones, Branson and McGee were frequently, but not always, the individuals selected by the Prophet to administer this punishment.

As previously noted, defendants are not charged with assault but, as will be discussed later in some detail, one of the elements of slavery is the subjugation of one person's mind and body by another. Consequently, the effect in the camp of the beatings, particularly on the children, is relevant to the relationship of the defendants to the children and to the ultimate issue of slavery. It would serve little purpose and require too much time for the court to review all of the evidence dealing with episodes of cruel and inhuman beatings of adults and children. Photographs received in evidence are stark proof not only of the whipping block and "Big Mac" but also vividly show open, ugly wounds on and around the buttocks area of women and children. However, a brief summary of the testimony of two former camp members, Daniel Yarbough and Antoine Anderson, will demonstrate conditions which prove beyond a reasonable doubt, that a climate of fear existed throughout the camp.

Daniel Yarbough, age 12, lived at the camp with his mother, brothers, and sister for a number of years. I found him to be bright, alert and credible. His court testimony gave a vivid picture of camp conditions. When he was 7 or 8, upon orders of the Prophet, he was burned on the face

with a hot iron, apparently in retribution for his younger brother having been accidentally burned while either in the care of or at least in the presence of the witness. The Prophet was notified that the youngest child had been burned and according to the witness "the Prophet came over and then he took—gave orders to Judah [William L. Lewis], Ezekial [Robert A. McGee] and Jabez [Larry E. Branson] to beat me. And Jabez holds me and Ezekial hold me. They hold my face like this. And then Judah [William L. Lewis] burned me." It was his further testimony that religious classes were held Wednesdays and Saturdays of each week and the first Saturday after the burning episode Daniel was directed by the Prophet to stand up and display his scar to the entire congregation.

Daniel also described the boys' work details of which he was a member. Defendants William L. Lewis, Larry E. Branson and Robert A. McGee usually gave the orders regarding the work that was to be done. These chores included cleaning the barn, cutting grass and rounding up the animals. Daniel testified that he was beaten if he failed to do as he was told.

On one occasion, Daniel broke a window in the barn, and he was whipped with Big Mac by defendant McGee. He testified that he still has scars from that beating (exhibits 50–51). On another occasion, his younger brother caught his hand in the washing machine and the Prophet, Robert A. McGee, Larry E. Branson and William L. Lewis came into Daniel's trailer, grabbed Daniel, held him by his hands and legs off the ground, and defendant McGee struck him with a stick repeatedly. His brothers and sister were beaten in the same manner.

Daniel testified to further beatings in the stock, and to beatings of his brothers and sister. In addition, he witnessed beatings in the stock of Dianna McCord, Gwendolyn Harris Williams and Celia Green, adult females. They were all struck repeatedly with Big Mac at the direction of the Prophet, and later Dianna McCord, the children's teacher, was ordered to show her injuries to the children in the schoolroom. Also present when these wounds were being displayed were the Prophet and Muriel King. Mrs. McCord's injuries included a hole on her buttocks where she had been repeatedly struck.

On another occasion, the witness testified that he saw defendant Jones beaten in the stock for at least 40 "licks." He was beaten in retribution for burns sustained to his baby when he dropped him or let him fall on some hot coals. Daniel quotes the Prophet as saying, "An eye for an eye and a tooth for a tooth." The following description of this incident was given by witness Anderson:

"A. He told the brothers, 'Take him over to the block and put him in the block and beat him.'
They gave him 80 licks.
Q. And did they put him in the block?
A. Yes, they did.
Q. And what happened after he was put in the block?
A. Nelson—He told Methusalah, he said, 'Get Big Mac.'
Q. And then what happened?
A. He gave him 20 licks. And he told Nelson that was enough. He told McGee, he told him, 'You go ahead, brother.' He gave him 20 licks. I'm not too for sure who the others were, but two more came up behind him and gave him 20 more apiece.
Q. Now who was present while all this was going on?
A. The congregation, the children.
Q. All right. And after they gave Mr. Jones these 80 licks, what happened?
A. He said, 'Go on back and get some hot coals out of there.'
Q. Who said that?
A. The Prophet said, 'Go on back there and get some hot coals out of there and burn him every place that that baby was burned.'
Q. Did someone get the coals?
A. Branson walked back there and got a pan, got some hot coals out of the wood stove, had them in a metal pan of some

sort. And the Prophet told him to turn the blocks around so that they could— the congregation could see them burn him. He turned the blocks around and kind of leaned it back. He got to the block with the hot coals. McGee put on a glove, grabbed a coal out of there and put it into Theodore Jones' mouth. Then they put one in each of his hands, a hot coal, where the baby had been burned on the hands. And they took the hot pan and rubbed it up against his forehead and burned him on the forehead because the baby had been burned on the forehead."

On another occasion Daniel's brother, John Yarbough, was beaten for trying to run away. Defendants McGee and Branson caught him in the area near the barn, brought him back and severely beat him before the entire class. This beating was ordered by the Prophet. Daniel testified further that he saw his brother John beaten on 40 or 50 other occasions.

On June 29, 1983, five days before his death, John was beaten "for not coming out to work." He apparently was in his trailer watching television when he was supposed to be reporting to work. He had been ordered by defendants McGee and Branson to assist in cleaning out a trailer from which someone had recently moved. John was grabbed by McGee and Branson and then whipped with Big Mac. Daniel testified that Larry Watkins, defendant Green, defendant McGee, defendant Branson and defendant William L. Lewis took turns "whupping" John. He stated that the Prophet was also present. The court notes that the identity of the persons present at this beating is in dispute. However, in the court's final analysis this factual dispute becomes irrelevant. After the beating, John Yarbough could hardly walk, was crying and didn't want to eat. Two days later, he was unable to eat. Daniel testified he got some water for John but he "just fell on the floor." Daniel further testified that at that time defendant Branson apparently tried to pick John up from the floor with pliers applied at his ears. The following day John Yarbough died.

According to the medical testimony, "He was beaten to death."

Daniel testified that the Prophet taught him that black people who did not belong to the House of Judah were "niggers" and that white people were heathens and beasts. When asked about contact with people outside the camp, he said he knew two black boys who lived down the road but had little contact with them since the Prophet said they were niggers. When asked why he had not tried to run away from the camp, Daniel testified "I was scared."

Another incident involving the boys' work detail was testified to by Antwyne Anderson, at one time a camp member and presently a member of the armed services. According to Anderson, the boys' work detail consisted of all the boys that were strong enough to work, including John, David, and Daniel Yarbough, Shawn Nelson, Emmanuel Jones, and Edwin and Russell Harris. He recalled that in late 1982, the boys' work detail was accused by Mrs. McCord, in front of the entire congregation, of forgetting to bring firewood into the classroom. When confronted by the Prophet, one of the boys replied, "My Lord, we forgot to bring the wood." The Prophet then asked "the brothers," defendants McGee, Branson and William L. Lewis, what should be done. They replied that the boys should be beaten, and each was given 10 to 15 "licks" before the entire congregation. Defendants Nelson, McGee and Green did the beating with a stick, hitting the boys "as hard as they can swing the stick." Some of the boys hollered, others cried. Following the beatings, the congregation stood up and clapped.

On another occasion, again in front of the congregation, defendant Branson got up and said, "My Lord, John Yarbough hasn't been working. He has been horsing around." When confronted by the Prophet, John denied the charge. When asked by the Prophet what he thought should be done, Branson replied, "He needs to be beaten." John was then beaten by defend-

ant Jones with a stick 15 to 20 times. John was hollering and trying to get loose, and the Prophet said "You better be still and shut up or I'll make them give you some more." Again, the congregation applauded.

Anderson confirmed the burning of Daniel Yarbough (Exhibit 49), recalling that the Prophet told the congregation that the council had gotten together and decided the boy should be burned.

On another occasion, witness Anderson saw another boy 8 or 9 years of age severely beaten by defendant Jones. Relying on biblical authority to the effect that those who do not obey should be beaten, the Prophet ordered that the boy be given 10 to 15 licks. According to Anderson, the "licks" administered at the camp were rendered "as hard as you can swing."

Around Christmas, 1982, Anderson saw adults Gwendolyn Harris and Shirley Washington placed in the stock and severely beaten with Big Mac. These two women were accused of having broken certain rules of the camp. The beating was done in the presence of the entire congregation including the two women's children. Again, the congregation applauded following the beatings.

In March, 1983, Anderson saw Gwendolyn Harris and Dianna McCord beaten on the same day. All the defendants were present as was the entire congregation. The prophet ordered that first Dianna McCord and then Gwendolyn Harris be given 40 "licks" with Big Mac. Defendant Jones hit each 20 times and then defendant McGee did likewise.

On another occasion in 1982, Anderson saw three women, Dianna McCord, Wilhemena Davis and Daria Ann Grant, put in the stock and beaten. Mrs. Davis was a very thin woman and according to Anderson did not fit well on the block. During the beating she urinated and afterwards partially collapsed in shock.

There were other ugly incidents such as the beating of Celia Green, wife of defendant Eddie Green. Defendant Green told the Prophet that his wife wasn't a good mother and should be beaten. The Prophet agreed and defendant Green then beat his wife in the stocks 30 times with Big Mac. Thereafter, to add to her agony, she was administered three bottles of Castor Oil.

Concerning work details Anderson confirmed that all men and boys were assigned to them. The boys were expected to work periods of the day when not attending the camp school.

He further testified that certain members of the camp acted as guards and apparently patrolled the perimeter of the camp. Three of them, defendants McGee, Branson and William L. Lewis carried firearms. Further, he described a sign-in and out book and testified that if members left the camp, they had to have someone with them. In other words, no one was permitted to leave the camp alone. A curfew was imposed and there was limited use of telephones plus some censorship of mail.

Without belaboring the point, I am satisfied from the evidence presented that the Government has proved beyond a reasonable doubt each of the overt acts set forth in paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 11 and 12 of the indictment.

The admissions of defendants William A. Lewis, Larry Branson, Theodore Jones, Eddie Green and Robert A. McGee contained in prior state court proceedings and in statements given to authorities, plus eyewitness testimony, establish beyond a reasonable doubt that each of the defendants participated and/or concurred in the episodes described above; and concurred in the brutal beatings, including those of John Yarbough, Edwin Harris, Russell Harris, Shawn Nelson, and Emmanuel Jones for failing to properly follow work orders. (It should be noted that the court used each of the admissions mentioned above as a statement against the declarant. Nothing said by one defendant was used to establish facts about or relating to another defendant.)

Likewise, I find a pervasive climate of fear existed in the camp at least among the children. The young Yarbough witness

specifically testified that he was too frightened to run away. There can be no question that the evidence established that the childrens' fears were deliberately reinforced by the beating of adults, (especially their own parents) as well as other children, often in the presence of the entire congregation. The evidence establishes that by these means the defendants held the children and compelled them to work on work details.

The fundamental legal issue of this case, the one with which the court must deal before it can analyze either counts I or II, is the definition of "holding to involuntary servitude."

I. "Holding to Involuntary Servitude"

18 U.S.C. § 1584 in relevant parts provides that "whoever knowingly and willfully holds to involuntary servitude ... any other person for any term, ... shall be fined ... or imprisoned ... or both."

■ In applying this statute, enacted to implement the Thirteenth Amendment, we must be careful that the purpose of that Amendment not be construed too narrowly. In *United States v. Booker*, 655 F.2d 562, 564 (4th Cir.1981), the court said: "The amendment and the legislation were intended to eradicate not merely the formal system of slavery that existed in the southern states prior to the Civil War, but all forms of compulsory, involuntary service. [citations omitted]."

In deciding the issue before us, one must consider the realities of modern life. As recent Federal Circuit Court cases point out, the contours of slavery have shifted since the enactment of the Thirteenth Amendment. *United States v. Warren*, 772 F.2d 827 (11th Cir.1985), *cert. denied, Moore v. United States*, — U.S. —, 106 S.Ct. 1214, 89 L.Ed.2d 326 (1986); *United States v. Mussry*, 726 F.2d 1448 (9th Cir. 1984), *cert. denied*, 469 U.S. 855, 105 S.Ct. 180, 83 L.Ed. 114 (1984); *Booker, supra.* No longer is the slave always black and the master white. And, while subtler forms of coercion have replaced the blatant methods of subjugation practiced in the ante-bellum South, these new practices are no less ef-

fective than their older counterparts. In its recent application of the Thirteenth Amendment, the 9th Circuit stated:

"The 13th Amendment and its enforcing statutes are designed to apply to a variety of circumstances and conditions. Neither is limited to the classic form of slavery. Both apply to contemporary as well as to historic forms of involuntary servitude. The amendment and statutes were intended not merely to end slavery but to maintain a system of completely free and voluntary labor throughout the United States .... [I]n general, the defense against oppressive hours, pay, working conditions, or treatment is the right to change employers. When the master can compel and the laborer cannot escape the obligation to go on, there is no power below to redress and no incentive above to relieve a harsh overlordship or unwholesome conditions of work. [quoting in part *Pollock v. Williams*, 322 U.S. 4, 17–18, 64 S.Ct. 792, 799–800, 88 L.Ed. 1095 (1944)]."

*Mussry, supra*, at 1451.

Finally, as evidence of the broadening of the scope of the Thirteenth Amendment, it should be noted that in recent years the courts have extended the protection of the Thirteenth Amendment to patients in mental institutions, *Downs v. Dept. of Public Welfare*, 368 F.Supp. 454 (E.D.Pa.1973); *See Wyatt v. Stickney*, 344 F.Supp. 373 (M.D.Ala.1972), 344 F.Supp. 387, *aff'd in part and remanded in part, Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir.1974), and juveniles in youth centers, *Santiago v. City of Philadelphia*, 435 F.Supp. 136 (E.D.Pa.1977); *King v. Carey*, 405 F.Supp. 41 (W.D.N.Y.1975). *See also, Bobilin v. Board of Education, State of Hawaii*, 403 F.Supp. 1095 (D.C.Hawaii, 1975). In *Bobilin* the court said:

"The purpose of the Thirteenth Amendment is to proscribe conditions of enforced compulsory service of one person to another. [citations omitted] ... The very essence of the Thirteenth Amendment is a prohibition against forcing one

person to labor against his will for the benefit of another person."

*Id.* at 1101.

■ The essence of a holding to involuntary servitude is an exercise of control by one person over another so that the latter is coerced into laboring for the former. *Mussry supra,* at 1452 (citations omitted). The use or threatened use of law or physical force is the most common method of forcing someone to enter into or remain in a state of involuntary servitude. *Id.*

■ As defined by Judge Friendly in *United States v. Schackney,* 333 F.2d 475, 486 (2nd Cir.1964):

"[A] holding in involuntary servitude means to us action by the master causing the servant to have, or to believe he has, no way to avoid continued service or confinement, in Mr. Justice Harlan's language, 'superior and overpowering force, constantly present and threatening.'"

This definition was further developed in *Mussry, supra* at 1453:

"A holding in involuntary servitude occurs when an individual coerces another into his service by improper or wrongful conduct that is intended to cause and does cause the other person to believe that he or she has no alternative but to perform the labor. In determining the question of involuntariness, the court should consider whether the challenged conduct would have had the claimed effect upon a reasonable person of the same general background and experience. Thus, the particular individual's background is relevant in deciding whether he or she was coerced into laboring for the defendant. [citation omitted]. ... Only improper or wrongful conduct on the part of an employer subjects him to prosecution."

■ Thus, in determining whether a person or persons knowingly and willfully held another to involuntary servitude, or aided and abetted in the holding of another to involuntary servitude, in violation of 18 U.S.C. § 1584 and § 2, a court, having first ascertained that the alleged victim or victims performed some type of labor at the direction of the alleged master, must ask two questions:

1. Was it the intent of the alleged masters, as evidenced through their improper acts, to totally subjugate the will of the victims for the purpose, at least in part, of obtaining the labor? and

2. Were the wills of the victims, in fact, so subjugated?

In count II of its indictment, the Government alleged that all of the defendants, except Muriel King, violated sections 1584 and 2. Given that the evidence is uncontroverted that the named victims, John Yarbough, Edwin Harris, Russell Harris, Shawn Nelson, and Emmanual Jones, performed work in and around the House of Judah Camp at the direction of the Prophet and the council, I shall proceed to apply the two-part analysis set forth above.

However, I would here drop two footnotes. First, the answer to the first question necessary to an analysis of count II, "Was it the intent of the alleged masters, as evidenced through their improper acts, to totally subjugate the will of the victims for the purpose, at least in part, of obtaining their labor?", is also determinative of the existence of one of the elements of the section 241 conspiracy charged in count I. This is because a finding that a group of individuals conspired to hold another in involuntary servitude requires the court to determine, beyond a reasonable doubt, that an agreement existed among the defendants and that at least one of the objectives and a specific intent of that agreement was the holding of others to involuntary servitude. Thus, my analysis of the defendants' intent, as evidenced through their actions, is as necessary to a finding that they conspired to commit involuntary servitude as it is to a finding that they did indeed commit involuntary servitude. Thus, I will address the question of their intent first and then, after completing my analysis of count II, examine the agreement element of count I.

■ Second, the effect of the inclusion of 18 U.S.C. § 2 in the indictment should be noted. Section 2 provides that:

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

The legislative intent of this section was to punish as a principal not only those who directly commit an offense and those who "aid, abet, counsel, command, induce or procure" another to commit an offense, but also anyone who causes the doing of an act which if done by him directly would render him guilty of an offense against the United States. *See, Revisor's Notes.* This provision eliminates the need for the court to distinguish between defendants who may have committed the crime described in § 1584 and those who might have aided and abetted in its commission.

Returning now to the two-part analysis necessary to the application of section 1584, it must first be remembered that the specific intent of any individual to commit a particular crime cannot be proved through direct evidence. It is simply impossible to look inside a person's mind to see precisely what his intent was. Generally, under the criminal law the inference may be drawn that people intend the natural and probable consequences of acts knowingly done, that is, acts done voluntarily and intentionally, and not because of mistake, accident, or other innocent error. *See,* E. Devitt & C. Blackmar, *Federal Jury Practice and Instruction,* §§ 14.04, 14.13 (1977). Taking that as our premise, it is clear beyond a reasonable doubt, that the intent of the defendants was to hold the boys to involuntary servitude. The beatings administered by defendants Branson, McGee, Green, Jones, and William L. Lewis at the order of the Prophet, were improper as that term is used in *Mussry.* The severity, frequency, and widespread nature of the beatings alone satisfy me that the defendants had the specific intent to subjugate the will of the boys, that is, to render them incapable of choosing a course other than that ordered by the Prophet and the other defendants.

In addition to severely beating the boys, the defendants publicly beat the boys' parents, their school teacher, and other adults thus making it unmistakably clear to the children that they could not look for help from those to whom children normally turn. In other words, the children could not escape defendants' coercion by turning to adult members of the camp. Similarly, the fact that the children were forced, by the Prophet and Muriel King, to view the chastisement wounds sustained by their teacher and the mother of the Harris boys evidences the intent of the defendants to convince the children that they had but one alternative and that was to do the work required of them by the Prophet and the council or be subject to brutal beatings.

In withdrawing the children from the public school system the defendants severely limited the boys' contact with the outside world and entirely eliminated their contact with outside authority figures. Council rules requiring members to sign in and out of the camp and to travel in pairs when leaving the camp, could only have been intended to further insulate the children and their parents from the outside world. The foreseeable consequence of these acts, the consequence that must have been envisioned and which the court finds was envisioned by the defendants, was the enhancement of their own superior position vis-a-vis the children. They must have known that their demands would thus become the overpowering influence and the "constantly present and threatening force" in the children's lives.

Finally, the carrying of firearms by the three defendants who had daily control of the boys' work detail, Larry Branson, Robert McGee, and William L. Lewis, is coercive. Though not necessarily improper in itself, the natural consequence of this act could only be the further subjugation of the children's wills.

Defendants have argued that children living with their parents cannot become the slaves of someone else; that children cannot be enslaved separate from the enslavement of their parents; and that the fact that some of the adults freely left and returned to the camp prevents a finding of slavery. Furthermore, they argue that the work in this case was of a non-commercial type normally undertaken by boys growing up on farms and consequently, that forcing children to do such work can not be classified as involuntary servitude. Finally, defendants argue that the existence of slavery is negated by the fact that the children were returned to the camp following a full investigation by the Probate Court's Task Force. Legal analysis and common sense require the rejection of each of these arguments.

■ It is true that no identical child slavery prosecution can be found in the books. However, as noted above, analysis of the case law reveals that the essence of involuntary servitude is the intent to and the actual subjugation of another person's will for the purpose, at least in part, of obtaining services. Although, as I ruled earlier in this case, parents cannot legally be found to have so subjugated their own children, case law does not require that this prohibition be unthinkingly extended to nonparents simply because alleged child-victims live with their parents. In all the slavery cases I have read, and I believe that I have read them all, I find no hint of such a narrow interpretation of the Thirteenth Amendment. The law simply cannot be read to hold that children living with their parents can only be enslaved by a third party if it is proved, beyond a reasonable doubt, that the third party enslaver not only held the children to involuntary servitude, but that he or she also intended to and did succeed in completely subjugating the wills of the children's parents. The law requires the court to analyze the alleged enslavement of a child independent of whether his or her parents were enslaved. When parents abdicate certain of their legal responsibilities toward their children, as the parents at the House of Judah

did in signing the council's contract, the law will not abandon those children.

■ In addition, the fact that some adults had some freedom to come and go and that one or more of the adults were in fact banished from the camp is irrelevant. The charges against these defendants focus on their intent to enslave particular children, not adults.

■ Likewise, the nature of the labor performed by the children is no more determinative of this case than their living arrangements. The evil of slavery is not in any way lessened because the subjugated individual is forced to do what might be called farm "chores" as opposed to agricultural work on a conventional commercial farm, as has frequently been the situation in the reported immigration-labor slavery cases.

■ And finally, what may have been done with the children by state authorities following a full blown investigation of camp conditions is also irrelevant. It is the conduct of defendants during the period of time set forth in the indictment that is crucial to their guilt or innocence. The court further notes that the Government's expert witness, although eminently qualified in the field of child abuse, made his study after the children had left the camp and while they were living in foster homes. Consequently, his testimony, except his objective physical findings, failed to convince the court of the existence or absence of any element of slavery at the camp during the period of time set forth in the indictment.

Thus, for the reasons set forth above, I find, beyond a reasonable doubt, that it was the intent of the defendants to completely subjugate the will of the named boys in order to ensure that they did the work requested of them.

I also find that the second question of the section 1584 examination, "Were the wills of the victims in fact subjugated?", must be answered in the affirmative. Taking into account the age of all of the victims named in count II and their limited

exposure to life beyond the confines of the camp and the strictures of the Prophet and council, I am, in fact, satisfied that the wills of John, David and Daniel Yarbough, Shawn Nelson, Emmanuel Jones, and Russell and Edwin Harris were subjugated by the defendants. However, since only John Yarbough is named in count II, the only relevant determination for the court is whether his will was, for any term, so subjugated.

To that question there can be only one answer. Yes. At least for the five days between the severe beating that John received on June 29, 1983 because he failed to return to work on time and his death, John was a subjugated individual, in both body and mind. John was not a passive child. He exhibited more strength of will than many of the other children (he attempted to run away at least once) and, had he lived, there might have been some question as to whether the defendants succeeded in completely subjugating him. However, he did not live.

■ Having found, beyond a reasonable doubt, that each of the charged defendants knowingly and willfully held John Yarbough to involuntary servitude in violation of Title 18 U.S.C. § 1854 and § 2, I find defendants William A. Lewis, William L. Lewis, Robert A. McGee, Larry E. Branson, Theodore R. Jones, Sr., and Eddie L. Green Jr. guilty as charged in count II.

## II. Conspiracy to Hold to Involuntary Servitude

Concerning the conspiracy charge contained in count I, it is charged that from about the fall of 1981, until on or about July 3, 1983, all of the defendants conspired to deny minors John Yarbough, Edwin Harris, Russell Harris, Shawn Nelson, and Emmanuel Jones their right to be free from involuntary servitude as provided by the Thirteenth Amendment to the Constitution, which conspiracy resulted in the death of John Yarbough.

■ The crime of conspiracy is succinctly described in *United States v. Moss*, 591 F.2d 428 (8th Cir.1979).

"The essence of a conspiracy is an agreement between two or more individuals to commit a crime. [citations omitted]. The agreement need not be formal or express. Indeed, since conspiracy is seldom susceptible of proof by direct evidence, it may be properly adduced from the conduct of the alleged conspirators and the attending circumstances. [citations omitted]. However, mere association with an individual engaged in an illegal enterprise does not make a person a conspirator. [citations omitted]. Nor is mere knowledge, approval or acquiescence in the object of an alleged conspiracy sufficient to render an individual a part of a conspiracy. There must exist some element of affirmative cooperation or agreement to cooperate in the object of the conspiracy. [citations omitted]."

Although useful, this, like any generic definition of conspiracy, cannot provide the intent standard to which the inferences that can be drawn from the acts of a particular group of defendants must be matched. That standard can only be discerned by an examination of the elements of the actual crime which is said to be one of the purposes of the alleged conspiracy. In other words, the mental element of a conspiracy which the Government must prove, the intent beyond the intent to agree, is identical to the intent of the crime which is the supposed objective of the conspiracy. "A conspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself." *Ingram v. United States*, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959) (citation omitted). In this case, that offense is the denial of the right to be free from slavery.

■ Thus, to make out a section 241 claim for conspiracy to "injure, oppress, threaten, or intimidate any citizen in the free exercise and enjoyment of any right or privilege secured to him by the United States," the Government must prove, beyond a reasonable doubt, first, that defend-

ants acted in an injurious, oppressive, threatening, or intimidating manner and second, that those actions were the result of an agreement, at least one objective of which was to deprive the five named children, citizens of the United States, of their Thirteenth Amendment right to be free from slavery. *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); *United States v. Price,* 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).

There is no need at this juncture to reiterate the facts set forth at the beginning of the opinion. Clearly the defendants acted in an injurious, oppressive, threatening and intimidating manner.

■ Neither need we reexamine the intent element. I am satisfied, as I demonstrated earlier, that all of the actions of all of the defendants, including Muriel King, reflected an intent to subject the five named children to involuntary servitude. The fact that the defendants may have had additional objectives is legally irrelevant as it is well settled that in a section 241 charge the Government need not prove that the denial of a constitutional right was the single or even the primary objective of the conspiracy. If it proves that it was but one of the objectives, section 241 will be satisfied. *Anderson v. United States,* 417 U.S. 211, 225–26, 94 S.Ct. 2253, 2262–63, 41 L.Ed.2d 20 (1974).

■ To find the existence of the agreement requisite to a criminal conspiracy, one need not find from the evidence that the alleged members entered into an express or formal agreement. *United States v. General Motors Corporation,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *United States v. Levinson,* 405 F.2d 971 (6th Cir. 1968), *cert. denied,* 395 U.S. 958, 89 S.Ct. 2097, 23 L.Ed.2d 744, (1969), *reh'g denied,* 396 U.S. 869, 90 S.Ct. 37, 24 L.Ed.2d 124 (1969). The evidence sustaining a conspiracy charge is almost always circumstantial. "The crime of conspiracy ... is seldom susceptible of proof by direct evidence. Proof of the crime may rest as it frequently does, on indirect or circumstantial evidence. The existence of a conspir-

acy may be inferred from evidence of related facts and circumstances from which it appears, as a reasonable and logical inference, that the activities of the participants in the criminal venture could not have been carried on except as the result of a preconceived scheme or common understanding. [citation omitted]."

*United States v. Ellis,* 595 F.2d 154, 160 (3rd Cir.1979), *cert. denied,* 444 U.S. 838, 100 S.Ct. 75, 62 L.Ed.2d 49 (1979).

■ Applying that standard here, I find that the proofs establish, beyond a reasonable doubt, that an agreement existed among the defendants to enslave the named minor children. The existence and governing function of the council, on which all of the defendants sat for some significant period of time, and the public role that the council took in the administration of punishment, including the punishment of the boys' work detail, are strong indicators that its members were united in a common goal. The fact that the Prophet, the undisputed leader of the camp and the council, often sought council guidance and approval in meting out punishment, underscores the degree to which the defendants' actions were part of a common scheme or plan. Finally, the constant communication between members on matters relating to the misbehavior of the children supports a finding that there was an agreement. Without this reporting back mechanism the Prophet and the other defendants would have found it difficult, if not impossible, to act in the concerted fashion necessary to establish and maintain a climate of fear such as the one that pervaded the camp.

■ Having found, from all of the evidence, beyond a reasonable doubt, that each of the defendants acted in an injurious, oppressive and threatening manner and that such acts were the result of an agreement at least one object of which was to deprive the five minor children, citizens of the United States, of their Thirteenth Amendment right to be free from slavery in violation of Title 18 U.S.C. § 241, I find

defendants William A. Lewis, William L. Lewis, Muriel S. King, Robert A. McGee, Larry E. Branson, Theodore R. Jones, Sr., and Eddie L. Green, Jr. guilty as charged in count I.

Finally, there remains one matter pertaining to count I with which I must deal, the sentence-enhancing charge that John Yarbough died as a result of the defendants' conspiracy. The maximum penalty for conspiracy in violation of section 241 is imprisonment for ten years. If, however, the Government proves that John Yarbough died as a result of acts committed in furtherance of the conspiracy, the defendants could be imprisoned for a term of life.

 The Government need not prove that the defendants intended John Yarbough to die as a result of their acts. As the court stated in *United States v. Guillette*, 547 F.2d 743, 749, (2d Cir.1976), *cert. denied*, 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977),

> "To confine the meaning of 'result' to direct causation not only would be at odds with common law principles of legal causation but also would seriously impair the effectiveness of § 241. The more severe punishment prescribed for those conspiracies resulting in death was designed to deter the type of conduct that creates a risk of loss of life or serious bodily injury."

The Government need only show that John Yarbough's death occurred as a "proximate result" of the defendants' actions. Where events are foreseeable and the natural result of one's criminal conduct, the chain of legal causation is unbroken and the perpetrator is held criminally responsible for the resulting harm. *United States v. Hayes*, 589 F.2d 811, 820-21 (5th Cir.1979), *cert. denied*, 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979).

 The evidence in this case establishes, beyond a reasonable doubt, that John Yarbough was beaten to death. Given the severity of the beating received by Yarbough on June 29, its close proximity in time to his death, and the medical testimony, I am convinced beyond a reasonable doubt that the defendants' actions in administering that beating were a proximate cause of his death.

 As noted earlier, some dispute exists over exactly which defendants were present during the June 29 incident. However, it is uncontroverted that, at a minimum, defendants Branson, Green and Jones were participants in the beating of John. No more need be established to hold all of the members of the conspiracy liable. It is an established legal principle that all of the members of a conspiracy are responsible for any acts done by another member in furtherance of the conspiracy. At the risk of belaboring the point, I note, as was discussed earlier, that the beating of John Yarbough for failing to return to work was undertaken in furtherance of the conspiracy to subject the named children to involuntary servitude.

### III. Conclusion

In summary, based on the evidence as appears in the record of this case, I find, beyond a reasonable doubt, that the named defendants are guilty of the charges contained in count I, death resulting, and the named defendants are guilty of the charges contained in count II. Furthermore, based on the evidence as it appears in the record of this case and the law discussed in the foregoing opinion, I deny defendants' third motion to dismiss and their motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29, both of which they renewed on September 8, 1986 at the close of their case.