**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Muriel S. KING (87–1040/1071), Robert A. McGee (87–1041), William Alexander Lewis (87–1042), Larry E. Branson (87–1072), William Lenard Lewis (87–1073), Theodore R. Jones (87–1074), Eddie L. Green (87–1075), Defendants–Appellants.**

Nos. 87–1040 to 87–1042, 87–1071 to 87–1075.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 12, 1987.

Decided March 4, 1988.

Rehearing and Rehearing En Banc Denied April 21, 1988.

---

Michael B. Quinn, Leroy Kramer, Larry C. Willey, Charles S. Rominger, Dennis Kolenda (argued), Anthony J. Valentine, Robert Mirque, Grand Rapids, Mich., for defendants-appellants.

Daniel L. Bell, II, Irving Gornstein (argued) Dept. of Justice, Washington, D.C., Donald A. Davis, Asst. U.S. Atty., Grand Rapids, Mich., for plaintiff-appellee.

Before MERRITT and NORRIS, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

MERRITT, Circuit Judge.

After a bench trial, District Judge Douglas Hillman convicted seven members of an unorthodox religious commune of two federal crimes: (1) willfully holding John Yarbough, a minor, to "involuntary servitude"

in violation of § 1584, Title 18;[1] and (2) conspiring to deprive Yarbough and other children living at the religious commune of their constitutional right to be free from "involuntary servitude" as guaranteed by the Thirteenth Amendment.[2] On appeal the seven defendants' principal contentions are that Judge Hillman erred for two reasons:

*First,* because he did not apply the definition of "holding to involuntary servitude" established in our opinion in *United States v. Kozminski,* 821 F.2d 1186 (6th Cir.1987), *cert. granted* [—— U.S. ——], 108 S.Ct. 225 [98 L.Ed.2d 185] (1987), an opinion of the Court sitting *en banc* delivered after Judge Hillman's opinion on the defendants' motion to dismiss and on the merits, 644 F.Supp. 1391 (W.D.Mich.1986).

*Second,* because the defendants are insulated from criminal liability because the children's parents, as members of the commune, consented in writing and orally to the beatings and physical threats which defendants used to make the children work. Thus by virtue of this consent the defendants share the parents' immunity under the Thirteenth Amendment.

Without authoritative precedent from this Court or the Supreme Court on the meaning of involuntary servitude at the time it rendered its decision, the District Court made alternative findings under alternative standards. We hold that one of the standards used, and the findings made thereunder, are fully consistent with our opinion in *Kozminski.* We also agree with the District Court that the defendants who committed the brutal acts do not share the immunity of the parents under the Thir-

teenth Amendment. We therefore affirm the judgment of the District Court.

## I.

In *Kozminski* this Court, sitting *en banc,* defined "holding to involuntary servitude" under §§ 1584 and 241 after tracing the purpose and history of the statutes by establishing a two part test, the last part of which has three alternatives:

We conclude that a "holding to involuntary servitude" occurs when (a) the servant believes that he or she has no viable alternative but to perform service for the master (b) because of (1) the master's use or threatened use of physical force, or (2) the master's use or threatened use of state-imposed legal coercion (*i.e.,* peonage), or (3) the master's use of fraud or deceit to obtain or maintain services where the servant is a minor, an immigrant or one who is mentally incompetent.

821 F.2d at 1192. We rejected a broader, "brainwashing," standard because such a standard "might appear to place the day-to-day activities of cult groups, communes and religious orders within the coverage of the statute." *Id.* at 1193. We noted that "our standard would criminalize these activities only if the group engaged in one of the proscribed types of conduct." *Id.*

The facts as found by the District Court are based upon overwhelming evidence, most of which is undisputed. The District Court carefully described the cult group and its practices in part as follows:

All of the defendants are members of a black, religious sect known as the House of Judah. It originated in the Chicago ghetto under the leadership of defendant William A. Lewis known as the "Proph-

---

1. Section 1584, Title 18, punishes as a felony: "Whoever knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude, any other person for any term, or brings within the United States any person so held...."

2. Section 241, Title 18, states the conspiracy offense as follows: "If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by

the Constitution or laws of the United States...."

The Thirteenth Amendment reads:
"Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.
Section 2. Congress shall have power to enforce this article by appropriate legislation."

et". The evidence is undisputed that from the very beginning he is the unchallenged head and ruler of the House of Judah. He is referred to as "My Lord Prophet David Israel" by other members including the defendants and bowed to and deferred to in all matters. The Prophet believes in the literal interpretation of the Old Testament; that he, as the Prophet, is God's representative on earth; that membership in the House of Judah is a prerequisite to salvation; that the members of his cult, black Hebrews, are the only legitimate, chosen people and the true historical Israelites. The Prophet also believes that all non-members are heathens, sinful and unworthy; that the road to salvation requires a learning of the distinction between good and evil as set forth in the Old Testament and as taught by the Prophet and further, that corporal punishment, referred to as "chastisement," is a proper and necessary means of punishment for those who break the rules of the House of Judah.

The group started with classes held in Chicago. Then, as the movement grew, the Prophet organized a camp in Western Michigan located in a relatively remote, rural area approximately 20 miles from Allegan. The camp consisted of close to 100 people who lived in approximately 30 trailers as well as two homes, one occupied by the Prophet and the other by defendant Muriel King, also known as "the Prophetess." In addition, there were other buildings on the property, one being a meeting hall and the other a classroom. The camp also had an area set aside for swings and other playground equipment for children. There were no fences or other barriers around the perimeter of the camp. Also on the property were a number of animals such as goats and cows.

As described by one of the witnesses, during the early years (middle to late '70s) the camp environment was warm, cooperative and friendly. By 1981, however, life at the camp began to change. Apparently the Prophet reached the conclusion that the House of Judah

members were backsliding, breaking camp and/or biblical rules. As a result, he established whippings as a means of punishment or chastisement.

In March 1982, the Prophet caused a document to be prepared and signed by adult members of the House of Judah in which members agreed to accept punishment for "sins against God and my Lord and also for my children." Punishment was specified in the document to include death, banishment, confiscation of material goods, imprisonment, beating, burning, hanging or stoning of both the adult member and that member's children. Prior thereto punishment had included fines, work assignments and the digging of large holes. But by 1981, "chastisement" included beating which could be imposed for such transgressions as disrespect for or disobedience to the Prophet, refusal to do assigned work, or violation of camp rules. As an implementation of the new whipping policy and as a means of instilling fear in both adults and children, Prophet Lewis ordered construction of a whipping block. It was fashioned after the stocks used in colonial days containing holes for the head and hands to confine offenders during the whippings.

In addition to the Prophet, the camp was also run by a council composed of the Prophet's closest associates, including his son and the Prophetess. All of the council members were appointed by the Prophet, and all of the defendants, during the period covered by the indictment, served at one time or another on this leadership council. Most of the whippings were done in the presence of the entire camp membership with the council members located near the stock and next to the Prophet. It was the practice of the Prophet, upon being advised of a member's transgression, to consult the council for a recommendation as to how many "licks" should be administered. It was the undisputed testimony that the Prophet would then order the transgressor to step forward. Making reference to some biblical authority or rule, the Prophet would order the individ-

ual into the stock to be beaten anywhere from 5 to 80 "licks." A heavy wooden axe handle labeled "Big Mac" was the implement used to beat the men, women and at least the bigger children. Defendants Jones, Branson and McGee were frequently, but not always, the individuals selected by the Prophet to administer this punishment.

*United States v. Lewis,* 644 F.Supp. 1391, 1395–96 (W.D.Mich.1986).

As a result of a particularly harsh and brutal series of beatings for not working, John Yarbough, a twelve year old boy whose mother was a member of the commune died. Other children were also brutally beaten, burned and disfigured. The District Court's opinion describes these facts in detail. *See Lewis,* 644 F.Supp. at 1395–1400.

## II.

■ Although the District Court first analyzed the case under the loose "subjugation of the will," or "brainwashing" standard set out in *United States v. Mussry,* 726 F.2d 1448 (9th Cir.1984), a standard we rejected in part in *Kozminski, see* 821 F.2d at 1189–91, the District Court made alternative findings that are entirely correct and fully consistent with our *Kozminski* test. The District Judge said:

The severity, frequency, and widespread nature of the beatings alone satisfy me that the defendants had the specific intent to subjugate the will of the boys, that is, to render them incapable of choosing a course other than that ordered by the Prophet and the other defendants.

In addition to severely beating the boys, the defendants publicly beat the boys' parents, their school teacher, and other adults thus making it unmistakably clear to the children that they could not look for help from those to whom children normally turn. In other words, the children could not escape defendants' coercion by turning to adult members of the camp. Similarly, the fact that the children were forced, by the Prophet and Muriel King, to view the chastisement

wounds sustained by their teacher and the mother of the Harris boys evidences the intent of the defendants to convince the children that they had but one alternative and that was to do the work required of them by the Prophet and the council or be subject to brutal beatings.

644 F.Supp. at 1402. In these findings, Judge Hillman anticipated our reasoning in *Kozminski* and gave the phrase "subjugation of the will" not a loose "brainwashing" meaning but a meaning which is consistent with our more strict definition of "involuntary servitude." Thus we decline to upset the verdict based on the defendants' argument that the District Court used the wrong definition of "involuntary servitude."

The activities of the defendant members of the cult group clearly fall within both the (a) and (b)(1) parts of the *Kozminski* standard. The evidence shows that the defendants repeatedly used and threatened to use physical force to make the children perform labor and that the children believed they had no viable alternative but to perform such labor. Furthermore, the conduct of the defendants extends far beyond the "day-to-day activities of cult groups, communes, and religious orders" that we referred to in *Kozminski.* There was evidence that work was performed by the children for the benefit of defendants personally, as well as for the community at large. John Yarbough and the others participated in cutting wood and doing farm chores. The wood, eggs, milk and other products of their labor were given to defendants who in turn sold them back to the members of the community. The income derived from the sale of the products was placed in bank accounts controlled by defendants, in part for their personal benefit, and not just for the benefit of the community at large. In addition, there was evidence from which one could reasonably conclude that the scope of work defendants required of the children went beyond that which would be warranted in order for them to discharge their communal responsibilities; that the nature and severity of physical force utilized by defendants

against John Yarbough went well beyond that which might reasonably be required for members of a communal society to successfully perform their assigned tasks of organizing or supervising shared work responsibilities of the community's juveniles; and that the excessive force was utilized by the defendants to compel extra services from the children that accrued to defendants' personal benefit.

The evidence also shows that it was the defendants' conduct, rather than some other restraint unique to children such as parental authority, dependence upon the parents, or a general fear of leaving home, that gave rise to John Yarbough's belief that he had no viable alternative but to serve the defendants. There was evidence that John Yarbough and the other children rendered service to the defendants as the result of the defendants' independent control over the children. There was evidence that John Yarbough and other juveniles wanted to leave, and that John Yarbough did in fact try to run away. However, testimony indicated that the beatings received by John Yarbough and others deterred them from leaving. Judge Hillman found that:

> [A] pervasive climate of fear existed in the camp at least among the children. The young Yarbough witness specifically testified that he was too frightened to run away. There can be no question that the evidence established that the children's fears were deliberately reinforced by the beating of adults, (especially their own parents) as well as other children, often in the presence of the entire congregation. The evidence establishes that by these means the defendants held the children and compelled them to work on work details.

644 F.Supp. at 1399–1400. In addition, he concluded that:

> The severity, frequency, and widespread nature of the beatings alone satisfy me that the defendants had the specific intent to subjugate the will of the boys, that is, to render them incapable of choosing a course other than that ordered by the Prophet and the other defendants.

.    .    .    .    .

> In withdrawing the children from the public school system the defendants severely limited the boys' contact with the outside world and entirely eliminated their contact with outside authority figures.... The foreseeable consequence of these acts, the consequence that must have been envisioned and which the court finds was envisioned by the defendants, was the enhancement of their own superior position vis-a-vis the children. They must have known that their demands would thus become the overpowering influence and the "constantly present and threatening force" in the children's lives.

> Finally, the carrying of firearms by the three defendants who had daily control of the boys' work detail ... is coercive. Though not necessarily improper in itself, the natural consequence of this act could only be the further subjugation of the children's wills.

644 F.Supp. at 1402.

In light of *Kozminski* the District Court was reasonable in its conclusion that the defendants held John Yarbough to involuntary servitude. Part (a) of the *Kozminski* test was met because the District Court reasonably concluded that but for the conduct of the defendants, John Yarbough would not have formed the belief that he had no viable alternative but to perform service for the defendants. The defendants' use and threatened use of physical force (part (b)(1) of the *Kozminski* test) is undisputed.

### III.

■ The primary defense of the seven defendants is based on the theory that the defendants share the parents' right to discipline their children, and hence the parents' immunity from criminal prosecution under § 1584. The defendants argue that no violation occurred because the parents themselves were free to leave and because the children were under the control of the parents. Therefore, the defendants argue, the first element of the *Kozminski* standard—

that the servant must be able to believe that he or she "has no viable alternative but to perform service for the master"—is not present. The defendants make the point as follows:

> [T]he record in this case establishes the following: (1) All of the children who lived at the House of Judah camp resided with their parents. (2) All the parents freely chose to live there and to have their children live with them. (3) Although they shared parenting with others, the parents were in control of their respective families. (4) The parents were free to leave at any time and to take their children with them....

> Admittedly, there was a "contract" acquiescing in physical punishment. But, it was not the diabolical document portrayed by the Government. It merely recited, accurately, Biblical passages commanding the faithful to listen to God's prophets and prescribing punishments for not doing so, and it agreed to accept them. And, no resident of the camp was required to sign it. All were given an option. If they did not want to sign, they could leave.

> Signing that contract for their families and choosing to live at the camp did [not?] (sic) amount to the abdication of parental responsibility. Parents cannot be said to have abdicated their responsibilities because they have made a choice with which others disagree.

(Appellants' Reply Brief, pp. 3–4, 8.)

The defendants' parental consent argument is persuasively answered by the Civil Rights Division of the Department of Justice in its brief:

> [T]he framers of the Thirteenth Amendment could not have intended to wholly exempt third parties who act with parental consent from the Amendment's prohibitions against slavery and involuntary servitude. The framers clearly did intend that parents were entitled to enter into master/apprentice agreements, and agreements analogous to them. But this was intended to be a limited exception to a deliberately broad prohibition and, where the established and understood bounds on such relationships were exceeded, the exception necessarily became inapplicable and the residual force of the Thirteenth Amendment could again be invoked. Specifically, when masters act outside the established bounds of the relationship either by using physical force that causes serious harm or by failing to provide appropriate care or education, they are subject to the Amendment's prohibitions. Any parent's consent to such an arrangement represents an abdication of parental responsibility upon which a third party would have no grounds to rely.

The Justice Department shows that parental consent cannot shield third parties from liability under § 1584 by analyzing the legislative history and purpose of the statute:

> The legislative history of the predecessor to Section 1584 firmly reinforces this conclusion. As this Court explained in *Kozminski*, Congress's principal goal in enacting the predecessor to Section 1584 in 1874 was to "outlaw the so-called 'Padrone' system of importing, selling and exploiting the labor of Italian children in the United States." [821 F.2d at 1190] As Congress undoubtedly knew, the Padrone system depended on the willingness of parents to permit their children to come to this country as servants of the padrones. *See United States v. Ancarola*, 1 F. 676 (C.C.S.D.N.Y.1880). Congress therefore could not have intended for parental consent to serve as a complete defense to an involuntary servitude charge. For such a defense would have defeated the very purpose Congress had when it enacted the 1874 Act.

(Gov. Brief at 29.) The government brief analyzed correctly the adverse social consequences of the defendants' proposed principle of absolute parental immunity shared vicariously by third parties:

> Recognition of a parental consent defense is particularly inappropriate on the facts of this case for another reason. Not only did the parents at the House of Judah authorize defendants to beat their children, they also abdicated any semblance of parental supervision and control. Indeed, as previously discussed,

the parents at the camp signed agreements that if they left the camp, they would leave their children behind. This kind of abdication of parental responsibility makes this case resemble even more the situation in *Ancarola*. There, as this Court noted in *Kozminski,* the children "were cast off by their parents, in violation of the law of Italy." [821 F.2d at 1192], quoting *Ancarola,* 1 F. at 683. The parents at the House of Judah likewise effectively abandoned their children into the hands of the Prophet and the other defendants. When parents explicitly renounce their parental relationship—by selling a child into slavery or abandoning him to involuntary servitude—parental consent cannot provide a subsequent defense for the third party.

Beyond that, the very public policy considerations cited by defendants in support of absolute immunity for parents dictate the opposite conclusion for third parties. As defendants point out "the natural affection between parent and child provides strong assurances that parents will usually utilize their special knowledge of the children to act in his or her best interest." A third party, however, has no such natural affection, as defendants' conduct amply demonstrates.

Finally, the consequences of accepting defendants' theory of third party immunity are far-reaching. Under defendants' theory, they could convert their camp into a profit-making farm, enclose it with electrified fences, use the children as the exclusive source of labor, work the children around the clock, place the children in chains while they work, and beat them to death if they do not do what they are told. As long as defendants could secure the parents' permission to this arrangement, it would not violate Section 1584 or the Thirteenth Amendment. The framers of Section 1584 and the Thirteenth Amendment could not have intended this result.

(Gov. Brief at 30–32 (notes omitted).)

The Thirteenth Amendment prohibits an individual from selling himself into bondage, and it likewise prohibits a family from selling its child into bondage.

The Western legal tradition prohibits contracts consenting in advance to suffer assaults and other criminal wrongs. They are void as against public policy. *See* Restatement (Second) of Torts §§ 191, 195 (1981) (promise involving commission of tort invalid). They do not insulate the wrongdoer from civil and criminal liability. Similarly a parent's contract allowing a third person to burn, assault or torture his child is void. *Id.* at § 194 (promise affecting custody invalid unless "consistent with best interest of child"). The contract does not become any more valid because the act in question is taken in the name of religion. Neither religion nor parental consent can save the Salem witch trials of children or the sale of a daughter into prostitution or the Padrone system of child labor or the House of Judah system of child beatings. Our law views the child as an individual with the dignity and humanity of other individuals, not as property. *See Ford v. Ford,* 371 U.S. 187, 193, 83 S.Ct. 273, 277, 9 L.Ed.2d 240 (1962) ("Unfortunately experience has shown that the question of custody so vital to a child's happiness and well-being, frequently cannot be left to the discretion of parents"), a case declining to enforce a child custody contract between parents under the full faith and credit clause; and *Knight v. Deavers,* 259 Ark. 45, 531 S.W.2d 252 (1976) (no "proprietary" rights in child, and courts will review contracts concerning children to see that they are in best interest of child). It views the parent-child relationship as one of reciprocal obligation and mutual respect. The principle of reciprocity that the law establishes does not have a place for bondage by parental consent or religious command.

We have reviewed all of the defendants' claims of error and find them to be without merit. Accordingly, the judgment of the District Court is affirmed.